STATE OF NORTH DAKOTA EX REL. W. S. SHAW v. LISLE THOMPSON, as City Auditor of the City of Minot, North Dakota.

(131 N. W. 231.)

Municipal Corporations — City Commissioners — Voters and Elections — Cumulative Voting.

   1. Chapter 45 of the Session Laws of 1907, prescribing the general law under which cities may adopt a plan of city government known as the commission system, does not authorize cumulative voting in the election of city commissioners.

Supreme Court — Prerogative Writs — Mandamus — Original Jurisdiction.

   2. Under the law the duty is upon the city auditor to prepare, and cause to

---

Note.—Exclusiveness of jurisdiction of court of last resort to issue remedial writs for prerogative purposes, see note in 13 L.R.A. (N.S.) 768.

   Original jurisdiction of court of last resort in mandamus case, see note in 58 L.R.A. 833.

be furnished, the ballots and election supplies necessary to the conduct of such election.

*Held,* under the facts peculiar to this case, that this court has the jurisdiction to issue an original writ, and the same is accordingly issued.

Opinion filed April 20, 1911.

Mandamus by the State, on the relation of W. S. Shaw, against Lisle Thompson, city auditor of Minot.

Writ granted.

*Palda, Greene, & Aaker,* for petitioner.

*Arthur Le Sueur,* for respondent.

Goss, J. This is an application to this court that it take original jurisdiction and issue its prerogative writ of mandamus on the application of petitioner, a private person, against the officer of a municipal corporation in a pending election matter. The original jurisdiction of this court is not challenged, but its right to issue its prerogative writ depends upon whether there exists sufficient jurisdictional cause for its prerogative use. These prerogative writs named in § 87 of the Constitution, excepting the writ of injunction, come to us as common-law writs modified by court usage, as ordinarily applied, until their high prerogative characteristics under which they were first used are ordinarily ignored and overlooked. But their use by this court is similar to that to which they were originally applied, namely, as high prerogative writs. As so used, they were then and now are issued in the exercise of sovereignty, through the medium of the court of last resort; and as so used are distinguished in nature from writs ordinarily termed by the same name in every day use in inferior courts. This court issues its prerogative writ only when invoked and moved so to do by matters affecting the sovereignty of this state, its franchises, or prerogatives as a state, or the liberties of its people, and then only when the circumstances demanding such writ are so extraordinary and peremptory that to intrust their determination to, or await their adjudication in, inferior courts, would result in failure or inadequacy of relief. See § 87 of our state Constitution and the following authorities: State v. Nelson County, 1 N. D. 88, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33; State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234; State ex rel. McCue v. Blaisdell, 18 N. D. 55, 24 L.R.A.(N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141; State ex rel. Mitchell v.

Larson, 13 N. D. 420, 101 N. W. 315; State ex rel. Hagendorf v. Blaisdell, 20 N. D. 622, 127 N. W. 720; State ex rel. Minehan v. Wing, 18 N. D. 242, 119 N. W. 944; State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705. These cases are illustrative of instances in which this court has taken or refused jurisdiction in application for original writs. Our Constitution is similar to that of Wisconsin and Colorado, and early decisions in those states furnished the precedent followed by this court in determining when original jurisdiction would be exercised in the issuance of prerogative writs. See Atty. Gen. v. Blossom, 1 Wis. 317, and two subsequent opinions by Chief Justice Ryan of that state in Atty. Gen. v. Chicago & N. W. R. Co. 35 Wis. 425, and Atty. Gen. v. Eau Claire, 37 Wis. 400. These are followed in the able opinion by Justice Corliss in State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234. Other interesting cases on the subject are: People ex rel. Atty. Gen. v. Tool, 35 Colo. 225, 6 L.R.A.(N.S.) 822, 117 Am. St. Rep. 198, 86 Pac. 224, 229, 231; People ex rel. Farmers' Reservoir & Irrig Co. v. Jefferson Dist. Ct. 46 Colo. 386, 24 L.R.A.(N.S.) 886, 133 Am. St. Rep. 84, 104 Pac. 484; State ex rel. West v. Cobb, 24 Okla. 662, 24 L.R.A.(N.S.) 639, 104 Pac. 361; State ex rel. Rinder v. Goff, 129 Wis. 668, 9 L.R.A.(N.S.) 916, 109 N. W. 628, and see also the editorial note in People ex rel. Graves v. District Ct. 13 L.R.A.(N.S.) 768.

The question now arises whether, under the facts as disclosed by relator's application, this court would be warranted in determining that it had jurisdiction to issue the prerogative writ prayed for. This involves the consideration of the facts presented, which we will briefly recite.

The respondent, the city auditor of a municipal corporation, the city of Minot, is about to present to the electors of that city, for their use in the coming city election on April 4th, a ballot upon which is a direction to the voters respecting candidates for city commissioners, contained in the following words printed upon the proposed ballots: "Vote for two or two votes for one." Three candidates, among them relator, seek election as city commissioners. There are but two such offices to be filled. The present board of city commissioners have authorized such ballot to be prepared for the avowed purpose of permitting cumulative voting for such candidate. The application further shows that if cumulative voting is permitted, it will be largely exercised, with the

result that if it is illegal the election will be invalidated, and the right of the electors of the municipality to a valid election and the full and legal choice of municipal officers be denied. Likewise, the private rights of relator as a candidate for said office will be infringed, and there will be cast upon him the unnecessary burden of defending in the courts any rights obtained by him under such election. Ballots permitting cumulative voting have been prepared by respondent, and will be used in the election unless prevented by court order. Application for a remedial writ was made to the district court of the district wherein the municipality in question is situated, and relief was denied. Relator has acted with the utmost of diligence since the contemplated act of the respondent has been known or made manifest. No adequate remedy exists at law or in equity to prevent such illegal act of the auditor respondent as is complained of, except the writ herein applied for, and if relator is denied the same, he is without relief.

The court will take judicial notice of the municipalities of the state operating under the plan of government known as the commission system of government for cities, as defined by chapter 45 of the Session Laws of 1907; that all cities operating thereunder hold their elections for the selection of their municipal officers at the same time; and that at the coming election many cities operating under the commission form of government will choose officers. In doing so they will operate under two conflicting methods, one or the other of which must be illegal, thereby tending toward uncertainty and embarrassment in the municipal government of these communities. That all such cities and the many thousand of electors in them will be similarly affected; that the time between this application and the election is too short to permit a determination, by a proceeding through the usual channels and methods of court procedure, of the question of legality of cumulative voting under such statute. The real question in litigation is not, primarily, the right of the relator to the office incidentally within the determination of the question submitted, but instead the decision of the method of the election, and the right of any elector among the thousands to vote more than one vote for one single candidate. The question before us is the construction of a law clearly affecting not only the local community and its candidates, but also the operation of the law throughout the entire state, in all cities having the commission plan of city government. The law is a new and important one of uniform applica-

tion throughout all cities similarly affected. Besides, the state, by reason of the taxing power of such municipalities, as well as its general welfare in them, is entitled to have a valid election in such local, self-governing bodies, that it may be assured of the regularity of the exercise of taxing powers procuring its revenue. It is further interested in having regularity in the election of such officers, that governmental functions may be properly exercised with uniformity throughout the state; this to the same extent as the state is interested in having all municipalities organized under general law, that the performance of official duties may be uniform as well as general. Also, all citizens and electors of the municipalities so affected have a right to have a law prescribing the method of election of their principal officers declared and settled. The fact that such officers have practically all to do with the rights of property, as well as enforcement of law and order affecting the people themselves directly under the commission system, radically different from that in cities without that plan, is urged as an additional reason why we should assume jurisdiction. It is a fact that under the commission system of government legislative, executive, and administrative powers of government are, for business purposes, such as directness and rapidity of operation, as well as economy, responsibility, and system, centralized in its commissioners, who exercise these governmental functions under a bureau system of city government. In this country, from time immemorial until this system was conceived and put in operation under force of circumstances amounting to catastrophy, no set of men in governmental affairs were intrusted, without a governmental system of checks or balances, with such general powers as under the commission system of government. Such, in brief, is the responsibility of the office sought by relator in his candidacy. And to the above extent has the state an interest in the event of our decision on the questions *publici juris* involved.

Under these circumstances we are impressed with the necessity to assume jurisdiction, and are convinced beyond the peradventure of a doubt that to do so is but the exercise of our sound discretion, which to do otherwise would be to abuse. Nor are we without precedent in so doing. In State ex rel. Rinder v. Goff, 129 Wis. 668, 9 L.R.A. (N.S.) 916, 109 N. W. 628, the Wisconsin supreme court holds the decision of a similar question arising on the construction of its primary election law, under less peremptory circumstances, to be a mat-

ter concerning the duty of the election officers of the state, and affecting thereby the sovereignty of the state and the liberties of its people, in aid of which, and to determine the course of official conduct to be pursued, the court assumed jurisdiction to hear and determine by the prerogative writ of mandamus. Likewise, the state of Colorado in People ex rel. Atty. Gen. v. Tool, 35 Colo. 225, 6 L.R.A.(N.S.) 822, 117 Am. St. Rep. 198, 86 Pac. 224, 229, 231, assumed jurisdiction to prevent wholesale election frauds in the city of Denver, holding that the state in its sovereign capacity, by the very terms of its being, is intrusted with powers and duties to be exercised and discharged for the general welfare, and for the protection of the rights and liberties of its citizens; and that the interest of the state in a legal election was sufficient to authorize the court by prerogative writ to prevent the wholesale threatened violation of such right. That it is the duty of the state to preserve unimpaired every channel through which powers are exercised necessary for the protection of the rights and liberties of its citizens; and to deny to the court of last resort the power to enforce by prerogative writ the sovereign rights of a state in such respects was to deny the supremacy of state government itself. We have similar precedent in this state. See State ex rel. Mitchell v. Larson, 13 N. D. 420, 101 N. W. 315. We will accordingly assume jurisdiction to hear and determine this application under the power conferred by § 87 of our Constitution.

This brings us to the method of election of city commissioners, and the question first to be considered thereunder is whether cumulative voting is permitted in electing officers in cities operating under the commission plan of government. Nowhere else in our scheme of state government is there a possibility for a contention that cumulative voting is allowed. If it is permitted in the case under consideration, § 15 of chapter 45 of the Session Laws of 1907, found on page 41 of said Session Laws, must be the authority therefor. This statute reads as follows: "Commissioners; how elected. The president of the board of city commissioners and four city commissioners shall be elected by the legal and qualified voters in the city in the following manner: The president of the board of city commissioners and the four city commissioners shall be elected at large, and not by wards. Each voter shall be allowed to cast but one vote for the candidate for the office of president of the board of city commissioners. Each voter shall be al-

lowed as many votes for the candidates for the office of city commis-
sioners as there are commissioners to be elected, such votes to be dis-
tributed among the candidates as the voter shall see fit, but no voter
shall be allowed to cast more votes than candidates to be elected." The
following section also has a bearing upon the interpretation of the fore-
going, reading: "Terms of office. Each of said four commissioners
and president of the board shall hold office for four years from and
after the date of his qualification, and until his successor shall have
been duly elected and duly qualified, except the first board; the two
commissioners receiving the highest number of votes shall hold for four
years, the two receiving the next highest for two years." In the chap-
ter are provisions declaring how vacancies may arise, and that same
may be filled by an election called for the purpose. Sections 33, 34, 36
and 21. And that officers so elected hold until the next regular election.
Section 35.

It is apparent from the particularity used in prescribing the man-
ner of election, qualification, appointment, and length of terms of offi-
cers, that the legislature, in enacting this chapter, did so with the idea
of putting in force thereby a statute as complete in these respects, as in
all other particulars, as it was novel in nature. A careful perusal of
the entire chapter convinces us that for breadth of subject as well as
for completeness in detail it is something unique and out of the ordi-
nary in legislation. The act creates officers formerly unknown and
designates them by new names, and, considering the way with which
all matters ordinarily left to general statute are provided, it is but
reasonable to conclude that the language of the entire act in all particu-
lars was carefully chosen, that the words as used might express the ex-
act meaning of the statutory intent, under the usual rules of statutory
construction. With this in mind, let us analyze the section of the stat-
ute heretofore quoted. Section 13 of the act provides: "The officers of
cities incorporated under this act shall be a president of the board of
city commissioners and four city commissioners, who, together with the
president, shall be known as the board of city commissioners." Section
15 is headed, accordingly, in logical sequence and precision: "Commis-
sioners, how elected. The president of the board of city commissioners
shall be elected by the legal and qualified voters in the city in the fol-
lowing manner: The president of the board of city commissioners and
the four city commissioners shall be elected at large, and not by wards.

Every voter shall be allowed to cast but one vote for the candidate for the office of president of the board of city commissioners. Each voter shall be allowed as many votes for the candidates for the office of city commissioners as there are commissioners to be elected, such votes to be distributed among the candidates as the voter shall see fit, but no voter shall be allowed to cast more votes than candidates to be elected." Applying the foregoing reasoning, bearing in mind the statutory provisions, there must always be candidates, that is, more than one candidate to be elected (and except in extraordinary and unusual cases, there can never be but two candidates for commissioners elected), it is plain the statute was framed purposely in the plural, thereby preventing cumulative voting, as a voter must to follow the statute strictly, and literally vote for at least two; and it is presumed the statute is to be construed in the light of its ordinary usage, which is for the election of two commissioners. But counsel for respondent may quote § 6720 of our statute, that "words used in the singular must include the plural, and the plural the singular, except when a contrary intention plainly appears," and inquire what will happen when, as in the case of a special election, if it be permitted under the statute at all, but one candidate can be elected. The answer is found in the fact that under the terms of the statute but one candidate could then be voted for, as "each voter shall be allowed as many votes for the candidates for the office of city commissioners as there are commissioners to be elected." Of necessity then, under any construction, before cumulative voting can be had, there must be more than one commissioner to be elected, and the idea of cumulative voting cannot apply where but one commissioner is to be elected. Such being the case where more than one candidate can be elected, in view of the fact that two is the ordinary and usual number to be elected, the statute expressly by its terms, taken literally, excludes the intention of the singular, and unless the statutory rule quoted the statute is to be construed in the light of the plural. When so construed,—in other words, when the plain statute as read is taken in its ordinary meaning in plural form,—it negatives cumulative voting by forbidding a voter to vote more than one vote for a candidate, as the voter has as many votes as there are candidates to be elected, and he must distribute his votes among the candidates, and in so doing, in order to comply with the statute, must, if he votes more than one vote, vote for at least two candidates. This negatives the very idea of cu-

21 N. D.—28.

mulative voting, as, in order to vote cumulatively, the voter must not
distribute his votes among the candidates, but instead concentrate his
votes upon one candidate, thereby casting more than one vote for some
one candidate. As the statute is framed in the plural, and as candidates
must be voted for if more than one vote is exercised by the voter, it is
impossible to do cumulative voting under the statute, unless at least
three commissioners are running for office, and this is an extraordinary
happening, something unusual. A statute is not construed on a basis
of what its operation may be in unusual events, but, on the contrary,
it is to be construed in the light of the usual method and usual con-
ditions incident to its application. Then again, if there can be no cu-
mulative voting when but one or but two (the latter the usual number)
commissioners are to be elected, it would be extremely unreasonable, to
say the least, to give a construction whereby cumulative voting would
be permitted when three or four commissioners can be elected. A stat-
ute, where possible, must be given a construction that will be uniform
in its operation, regardless of numbers of offices to fill.

But respondent contends that the provision thereof relative to the
election of president is to be construed together with the statute as to
election of commissioners, and that the statute providing "each voter
shall be allowed to cast but one vote for the candidate for the office of
president of the board of city commissioners" is an indication that it
was intended that the voter can distribute as many votes as there were
commissioners to be elected among the candidates, as the voter should
see fit, and that it was intended thereby that the voter could vote cu-
mulatively on commissioners. Such a construction would, for previous-
ly stated reasons, not grant cumulative voting. Then again such a con-
struction overlooks the reason why the law provided that "each voter
shall be allowed to cast but one vote for the candidate for the office of
president." The statute was framed to be definite and certain, "to a
certain intent in every particular," when construed as a whole.

Attention is called to the use of the word "distribute" in the clause,
"such votes to be distributed among the candidates as the voter shall
see fit." If this word "distribute" is to be construed as meaning cumu-
late or concentrate, or to be applied as used synonymously with either
of those terms, the word would certainly not be used in its usual sense,
and indeed a new definition from any to be found would be necessary,
if we were to say such use was proper. Webster defines "distribute"

as follows: "Distribute: To divide among several or many—to deal out—to allot." Accordingly, "to divide among several or many" would negative cumulative voting, in the sense that it would be inconsistent with concentrating votes upon one. To divide votes among many is to vote for more than one; so is the act of apportioning votes among many, likewise, to allot votes among many. Considering that at least two candidates must be elected in every election contemplated by the statute, except in emergencies not contemplated, it is clear the proper interpretation of the statute containing this term irresistibly compels its construction to mean that, where two candidates are to be elected in an election, when the voter has two votes, as many as candidates standing for election, the voter, if he exercises his full right of franchise, must vote, in dividing his votes among several, for at least two candidates. Again we find the word under its correct definition, although used perhaps peculiarly, exactly expressing the intent of the lawmakers, and fitting in as a part of a statute as literally complete as it is exact.

Again the word "distribute" has been interpreted judicially as meaning "spreading." See Morgan v. Baltimore, 58 Md. 509, 519. What is true as to the application of the Websterian definition as above is true as to this definition. Certainly, if the votes are spread, they cannot alight on one lone candidate. The use of the word "distribute" then cannot be held to be synonymous with "concentrate" or "cumulate."

In this connection, bearing in mind that § 13, as heretofore quoted, designates both the president and the commissioners as the board of city commissioners, and § 15 mentioned them as "commissioners; how elected," collectively, and discriminates as to manner of election between the president and commissioners, the statute would be incomplete without the provision referred to, that "each voter shall be allowed to cast but one vote for the candidate for the office of president of the board of city commissioners." In other words, without this provision the same counsel would be contending that, inasmuch as the candidates for office of city commissioners were by the last portion of the paragraph definitely provided for, as to their election, and the question of election of the president of the board not provided for, either the president was to be elected as a city commissioner and receive votes distributed among city commissioners, perhaps cumulatively, or else that no definite procedure at all was prescribed for his election, either of which would be certainly as reasonable a construction of the statute as the one now

urged.  In view of the care with which this act as a whole is framed, and considering that when construed as a definite direction to voters as to each officer in a class, president and commissioners respectively, the statute itself classifying them, and expressly defining it as positive, plain, unequivocal, and unambiguous terms as English language can convey, the manner of their election, with the unusual particularity of prescribing the manner of exercise of suffrage concerning the election of each, it would seem that the plain intent as determined from ordinary construction of plain English would be given, instead of a forced construction wholly inapplicable.  To hold otherwise would be in violation of the rule of law that the whole statute is to be construed together, and if, when so construed, the statute be definite, clear, explicit, and applicable, such construction must prevail.  We certainly cannot, because of the unusual detail in which the statute in its completeness is set forth, and the precision with which words therein are used, imply an intent on the part of the legislature in framing the act to mean other than what is so set forth in the statute.  It would be a queer doctrine of statutory construction that a statute taken as a whole could be so complete and definite that it should be interpreted otherwise.

Another matter deserving attention is noticeable regarding this section of the statute.  This is the last clause, reading:  "But no voter shall be allowed to cast more votes than there are candidates to be elected."  This clause is wholly unnecessary so far as defining the number of votes the voter may cast, as that matter is covered by the first clause in the last half of the paragraph, which clause reads:  "Each voter shall be allowed as many votes for candidates for the office of city commissioners as there are commissioners to be elected;" which provision amply covers this question.  Taken together, these two sections would read as follows:  "Each voter shall be allowed as many votes for the candidates for the office of city commissioners as there are commissioners to be elected,—but no voter shall be allowed to cast more votes than candidates to be elected."  These two provisions placed in such relation to each other show that the last provision is wholly unnecessary, except that its only purpose is to serve to make this part of the statute mandatory.  It is a negative provision in terms, and the only purpose it can serve is to characterize and indicate the construction to be given to the entire portion of the statute relative to election of commissioners, and so require the court to give a strict construction to it, and pre-

vent anything from being read into the statute not already found therein. Our court has construed similar language in election statutes to this effect. See Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95, construing the registration statute that "no votes shall be received at any election," unless the voters were registered in cities wherein the registration laws apply. This is held to be not a permissive phrase, but a mandatory direction. The same intent is here apparent in the same class of statutes as this, also is an election regulation. Negative words in a grant of power are never construed as merely directory. Sutherland, Stat. Constr. Secs. 611 and 627; Bladen v. Philadelphia, 60 Pa. 464, 465; Fitzmaurice v. Willis, supra, and many authorities therein cited.

Then again, in no election under our scheme of state government have we a provision whereby cumulative voting is sanctioned. If the section under discussion was intended to permit this procedure, unheard of and unknown so far as our election machinery is concerned, would they not have, in departing from usual precedent, been as particular in framing this statute as to this radical departure from the ordinary, as they have been throughout the same statute in all other matters, not leaving something so radically new dependent for its existence upon a peculiar and forced construction. If the statute is not explicit, but ambiguous, this feature alone is sufficient from which the court would be compelled to construe it as not carving out a new system for elections, but rather as referring to existing conditions. In this connection the words of Chief Justice Marshall in United States v. Fisher, 2 Cranch, 358, on page 390 thereof (2 L. ed. 304, 314), construing a statute where a similar unusual court interpretation of it was sought, apply with as much force and as aptly as though he was deciding the case on trial. The words of the eminent chief justice are: "Where rights are infringed, where fundamental principles are overthrown, where the general system of law is departed from, the legislative intention must be expressed with irresistible clearness, to' induce a court of justice to suppose a design to effect such objects." But the legislature must be understood to mean what it has plainly expressed. If the legislative intent is plainly expressed, so that the act, read by itself or in connection with other statutes pertaining to other subjects, is clear, certain, and unambiguous, the courts have only the simple, obvious duty to enforce the law according to its terms. When a statute is passed as

a whole, and consisting of parts or sections, it is animated by a general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section, and so as to produce a harmonious whole. The general intent should be kept in view in determining the scope or meaning in any part, and this general intent is the giving to the meaning of all the parts the intention of the whole act controlling the interpretation of the several parts. 2 Sutherland Stat. Constr. chap. 13. Under the foregoing rules for construction of statutes as above applied, this statute is a definite, precise, clear definition of the right of the voter in the manner of choosing the board of city commissioners.

Nor is this all. We have other forcible reasons for holding that the legislature did not intend to permit cumulative voting in this solitary instance. The statute generally declares with exactness and nicety all matters regarding the manner of exercising the right of franchise. Safeguards are thrown about the voter that a free exercise of this right may be had. Such is the object of our Australian ballot system, and with this intent the legislatures have ordinarily prescribed even to the form of the ballot, and provided that in cases where not prescribed with exactness, general laws apply. The voter must place his cross indicating his intention to vote in the prescribed place required on the ballot, to be regarded as an expression of his intention, and this when he can vote but once for any one candidate for one office. Would it not be strange, then, that the legislature should, had they intended this statutory provision to have granted a new and untried right in suffrage matters, entirely omit to prescribe more definitely the manner of its exercise as to where or how the voter should mark his ballot? Rather would they not instead have prescribed how the ballot should be prepared, where the voter should mark it to express his intention, and stated somewhere in the measure that the voter could vote more than one vote for one candidate if he so desired? If this statute be held to grant the right of cumulative voting, there is no form of ballot prescribed or provided for in the exercise of that right; and this important matter is left to the caprice of the officer preparing the ballot in the first instance, then to the conjecture of the elector in voting, and finally to the uncertain discretion of election officers counting results. All this is significant, when considered in connection with the precision and exactness of the whole chapter in question, condemning such a construc-

tion leading to such uncertainty, manifestly contrary to expressed legislative intent.

As shedding further light on this matter, let us trace the origin of the statute as to commission form of government, to determine from where the chapter was taken, and then again from what § 15 of the statute was procured. It is significant that nowhere in the Galveston charter is cumulative voting permitted, nor is it permitted under the Iowa statutes for the organization of city government under the commission form. We have searched in vain for any cumulative voting privilege under statutes granting commission system of government for cities. Our statute follows, and to a considerable extent is patterned after, the Galveston charter, and also contains some features of the Iowa general statute as to such matters. In neither state is cumulative voting permitted, so the system was not borrowed with a cumulative voting provision a part thereof. We find in Illinois, however, two statutes of nearly the same wording, both by their terms expressly and definitely granting in exact words the right to vote cumulatively. The first applies to election of members of the legislative assembly of Illinois, found in vol. 1, page 123, of the Statutes of Illinois, as follows: "House; minority representation. The house of representatives shall consist of three times the number of the members of the senate, and the term of office shall be two years. Three representatives shall be elected in each senatorial district. . . . In all elections of representatives aforesaid, each qualified voter may cast as many votes for one candidate as there are representatives to be elected, or may distribute the same or equal parts thereof among the candidates as he shall see fit, and the candidates highest in votes shall be declared elected." It is noticeable that, while the phraseology of this section is similar, yet if our statute was patterned after it in such respect, the omission of the words "for one candidate" and the phrase "or equal parts thereof" would thereby evidence a legislative intention against cumulative voting by the omission of the very provisions making cumulative voting definite and certain, or, in other words, granting it.

However, if the statute is patterned after the Illinois statutes, chap. 24, pt. I, article four, of vol. 1, of the Statutes of 1896, again a significant omission occurs. This article provides in express terms at length as to how cities may by vote provide for a minority representation in the city council by the election of aldermen under the minority,

plan, which statute, however, has carefully outlinued the object as that of procuring minority representation on such council, and how it should be adopted, and contains in § 55 thereof, on page 688 of said statutes, the following: "Aldermen; minority plan. Every such district shall be entitled to three aldermen who shall hold their office for two years, and until their successors shall be elected and qualified. At the first general election for mayor after the passage of this act, and every two years thereafter, there shall be elected in each ward as many aldermen as such ward shall be entitled to. . . . In all elections for aldermen aforesaid, each qualified voter may cast as many votes as there are aldermen to be elected in his district, or may distribute the same or equal parts thereof among the candidates as he shall see fit, and the candidate highest in votes shall be declared elected." It is noticeable that, while the phraseology is similar to our statute in question, the statute must be read in connection with the context, and in the light of declared minority representation, and containing the words "or equal parts thereof," and aided in construction by the provision for minority representation in the legislative assembly still more particularly declaring cumulative voting, and the Illinois Constitution amended purposely to permit cumulative voting; all taken together leave the construction of the Illinois statute beyond question. The object of said statutes is declared to be the granting of minority representation in the general assembly and in the city councils. There is no question of the intent of the lawmakers, and no question of statutory construction. In construing our statute can we conclude beyond question that the same was borrowed or patterned after those of Illinois quoted, with the purpose of granting cumulative voting, while the very words giving certainty to those acts, providing therefor, and declaring the intent to be minority representation, were omitted? If so, they were purposely omitted, that the intent should not be that of said statutes, and that cumulative voting should not be ingrafted even by construction into the new experimental law for the commission system of city government. Nor can we believe that, if our statute corresponds in peculiarity of phraseology to either of the ones quoted, such omission of this material feature of those statutes, bearing directly on cumulative voting, was accidental.

Our construction of the statute is aided and fortified by the very theory of representative government itself, as well as the history of our commonwealth since prior to statehood; all of which it is no violent

presumption to conclude the legislative body, whom we intrust with promulgation of our laws, keep in mind. We have stated that nowhere have we a provision for cumulative voting in state, county, or municipal governments. On the contrary the fundamental idea underlying the elective franchise has always been one of the exercise of a privilege of choice, as well as the exercise of individual power incidental thereto; that each voter is privileged to make his single choice for each elective official. That each voter should have equal rights under the law, not only to exercise an equal power, but to manifest equally his choice that the election reflect the will of the majority, whose will so exercised to that extent is law. That no double right of suffrage is granted to any one individual, but that every voter have the privilege of exercising his ballot in the same manner, with the same effect, under the same plan, for the same purpose, with no greater power than that of any other qualified voter. Every elector is then, as respects the ballot, the peer of every other elector. Equality under and before the law has applied in the past in the exercise of franchise as well as in all other governmental rights and privileges.

In this connection it is interesting to note that members constituting our constitutional convention were elected under a minority representation plan. See § 3, enabling act (Act Feb. 22, 1889, chap. 180, 25 Stat. at L. 676). And such convention was organized throughout on the plan of representation to the minority party; and during such convention a scheme of minority representation was urged. The system above referred to, then in vogue in Illinois, for election of members to the general assembly, was referred to and sought to be made a part of our Constitution by a portion of the convention, but the proposition was lost, and as a result no authority for minority representation appears in our state Constitution as to governmental matters. See Debates of Constitutional Convention of 1889, page 347. As further proof that minority representation, of which cumulative voting is but one method thereof, was in the minds of the framers of our Constitution when in convention assembled, we find § 135 of our Constitution providing: "In all elections for directors or managers of a corporation, each member or shareholder may cast the whole number of his votes for one candidate, or distribute them upon two or more candidates, as he may prefer." Had the legislature cumulative voting in mind when they passed chapter 45 in 1907, they could have found no more apt words to de-

clare the same, had they so intended, than in § 135 of the Constitution above quoted. In the light of the history of this state, we may conclude, without passing upon the constitutionality of this act, that the legislature did not, if they had an eye. to the past, intend to declare cumulative voting permissible by § 15 of chapter 45, Sess. Laws 1907.

Respondent claims there is no duty resting upon him to prepare the official ballots to be used in the election, and, accordingly, this court is without authority to interfere with his contemplated action, in that it is beyond the scope of his official duty. Granting his threatened act to be in excess of his official duty, it is because thereof no less· an illegal act, if performed, than the erroneous performance of duties enjoined by statute. An illegal act of commission is no less illegal than such an act of omission. But we are satisfied relator is under a duty placed upon him by statute to furnish legal ballots and election supplies necessary for use in such election. Section 14 of the act providing for commission government for cities requires the city auditor to give notice of this election, and further provides that "in all other respects such election shall be conducted as prescribed by general laws, except that no registration of voters shall be required unless provided for by ordinance." Section 39 of the same act, under the heading of "City Auditor; powers and duties," prescribes: "He shall have such power and authority, and perform such duties, as auditors of cities and villages may be required to perform under the general laws." Under this statute it is plain that the powers and duties resting upon the auditor are the same as those required of auditors in cities and villages, without regard to the commission form of government. And under the general law existing prior to the passage of this statute, and in perfect harmony therewith, we find, in § 618 of the Revised Statutes of 1905, the following: "The municipal or city auditor or clerk, as the case may be, shall prepare and direct the printing and distributing of all ballots for municipal or city elections, and for all questions that may be submitted to a vote of the electors of such municipality." As there is no officer officially designated as clerk in municipal government of cities, and as the statute is framed also to cover elections in civil townships and school districts, it is plain that the duty mentioned by the statute rests upon the city auditor, and on no other official. For the foregoing reasons a writ should issue herein, directing the city auditor to prepare and distribute for the use of the electors in such election a

legal ballot with petitioner's name thereon as a candidate for city commissioner, and that such ballot contain a direction that the elector shall be instructed to vote for two only of the candidates for such office, and that the words "or two votes for one" be omitted from such direction to the voter, cumulative voting at such election not being permitted by law. Accordingly it is so ordered.

All concur excepting MORGAN, Ch. J., not participating, Hon. W. C. CRAWFORD, Judge of the Tenth Judicial District, sat by request.

SPALDING, J. (concurring). While I concur in the conclusion arrived at in the foregoing opinion, I wish also to say that in my judgment the provision of the statute complained of, if it does contemplate minority representation by the method of cumulative voting, is invalid. Similar provisions in principle have been passed upon by the courts of a number of the states, and have generally been held unconstitutional. It is true that the method of voting in some such states was restrictive rather than cumulative, but both methods have as the object the permitting of minority representation, and the principle is practically the same whether it is done by means of restricting the voter to voting for candidates for a part of the offices, or permitting his vote to count as more than one for some of the candidates. The result is attained in one instance by division and in the other by multiplication. The theory of cumulative voting without constitutional permission rests upon a false or fictitious premise. It assumes that the computation of the number of marks placed upon a ballot in favor of a candidate should determine whether he is elected, when in fact the marks are, and can only be, representative of persons possessing certain qualifications. The end sought is to determine how many persons who have registered their preference by voting in favor of the election of a particular candidate, and the number of such persons cannot be increased or diminished by any false or fictitious system of marking the ballots. The placing of marks upon the ballot is only a method of enumerating persons, and if the number of persons desiring the election of a named candidate can be multiplied by two by the fiat of the legislature, it can, by the same means, be multiplied indefinitely. Our system of government is based upon the doctrine that the majority rules. This does not mean a majority of marks, but a majority of persons possessing the necessary qualifications, and the number of such persons is ascertained by means of an election.

The subject is a most interesting one, and would bear more extended discussion, but I submit that the objections offered are fundamental and controlling, regardless of all theories of those who would, by means more or less indirect, make it possible for a minority to secure representation where not entitled to it under our system.

FISK, J. (concurring specially). While I concur in the conclusion that the writ should be issued, I am unable to agree with my associates upon the reasons set forth in the majority opinion. I deem it needless to enter into any extended discussion of the views which I entertain, and will content myself by merely stating that in my opinion the statute in question clearly evinces a legislative intent to adopt the cumulative method of voting for city commissioners. I am unable to construe said statute as expressing any other purpose.

I am equally convinced that, such being the legislative intent, the statute is unconstitutional. My views on this question are fully expressed by Champlin, Ch. J., in Maynard v. First Representative Dist. 84 Mich. 228, 11 L.R.A. 332, 47 N. W. 756, and cases cited. See also McCrary, Elections, 4th ed. § 212, and general note on the subject of Minority Representation on pages 158–160.

In the constitutional convention an unsuccessful effort was made to adopt the rule of minority representation in the election of members of the house of representatives in this state. See Debates, Constitutional Convention, pp. 347–349. It is a significant fact that the only place in the Constitution recognizing the right of cumulative voting is in § 135, relating to elections of directors and managers of private corporations, and I think it clearly apparent that it was the intention of the framers of our Constitution to restrict such right to such elections, and to none others.