[Civ. No. 2448.    Third Appellate District.—October 23, 1922.]

THE PEOPLE ex rel., Appellant, v. ALBERT ELKUS et al., Respondents.

[1] ELECTIONS—SEVERAL OFFICES—LIMITATION OF RIGHT OF VOTING.— The election of nine members of a city council is the election of persons to nine offices as fully as if the offices were distinct in name and in the duties to be discharged, and it is beyond the legislative power to limit an elector to the right of voting for one candidate therefor.

[2] ID.—PROPORTIONAL SYSTEM OF VOTING—FREEHOLDERS' CHARTER— CONSTITUTIONAL LAW.—The provision of section 8½ of article XI of the state constitution that chartered cities may provide in their charter "the manner in which, the method of which, the times at which, and the terms for which the . . . officers . . . shall be elected," does not authorize such cities to adopt the Hare or proportional representation system of voting; and that system of voting is violative of section 1 of article II of the constitution, which provides that every qualified elector "shall be entitled to vote at all elections which are now or may hereafter be authorized by law."

[3] ID.—DE FACTO OFFICERS—VALIDITY OF ACTS.—Where persons are elected and act as members of a city council under color of legal authority, they are *de facto* officers, notwithstanding the provisions of the charter under which they were elected are unconstitutional, and their official acts, within the scope of their authority as defined by the charter, are valid and will continue to be valid until they are legally deposed from office.

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Reversed.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, G. W. Bedeau and Ray T. Coughlin for Appellant.

R. L. Shinn, Devlin & Devlin, Elliott & Atkinson and Clinton L. Harber for Respondents.

2. Validity and construction of statute providing preferential system of voting, note, Ann. Cas. 1917C, 482.

3. Person elected or appointed under unconstitutional statute as *de facto* officer, note, Ann. Cas. 1915C, 498.

FINCH, P. J.—As the result of an election held on the third day of May, 1921, the defendants were declared elected members of the city council of the city of Sacramento. They entered upon the discharge of their duties as such and have continuously thereafter acted as such city council. This suit was instituted to oust them from office on the ground that the charter provisions under which they were elected are unconstitutional. The defendants' demurrer to the complaint was sustained and, the plaintiff declining to amend, judgment was entered for the defendants.

The Sacramento charter provides for the election of the city council "by the proportional representation system" known as the Hare system of voting. The only question presented by this appeal is whether such proportional representation system is constitutional. Section 273 of the charter provides: "The full name of all regularly nominated candidates shall be printed on the official ballots in the alphabetical order of the surnames. The ballots shall be marked according to the following instructions, which shall be printed at the top of each ballot under the heading of 'Directions to Voters.' Put the figure 1 opposite the name of your first choice. If you want to express also second, third, and other choices, do so by putting the figure 2 opposite the name of your second choice, the figure 3 opposite the name of your third choice, and so on. In this way you may express as many choices as you please. The more choices you express, the surer you are to make your ballot count for one of the candidates you favor. This ballot will not be counted for your second choice, unless it is found that it cannot help your first; it will not be counted for your third choice unless it is found that it cannot help either your first or your second, etc. A ballot is spoiled if the figure 1 is put opposite more than one name." The complicated system of counting the votes and ascertaining the result of the election under the Hare system, as provided by the charter, is substantially set forth in detail in *Wattles* v. *Upjohn,* 211 Mich. 514 [179 N. W. 335], and need not be here repeated. For the purposes of this opinion it is sufficient to say that, though nine members of the city council were to be elected at large, no ballot could be or was counted for more than one candidate, whether counted as the elector's first, second, or additional choice. In the lan-

guage of counsel for appellant, "when once counted it be-comes dead." Candidates are elected, not by a majority or a plurality, but by a "quota or constituency" of votes. Section 274 of the charter directs the separation of the ballots into "valid" and "invalid" lots and provides: "(d) The whole number of valid ballots shall then be divided by a number greater by 1 than the number of seats to be filled. The next whole number larger than the resulting quotient is the quota or constituency that suffices to elect a member. (e) All candidates the number of whose votes on the first count equal or exceed the quota shall then be declared elected. (f) All votes obtained by any candidate in excess of the quota shall be termed his surplus." Elaborate provision is made for the count of second choice votes appearing on "transferable ballots," viz., surplus ballots, if any, and ballots containing first choice votes for "the candidate lowest on the poll," who is declared defeated. Third and additional choice votes are then successively counted by a similar process, where necessary to determine the result of the election, each candidate being declared elected when the number of his votes equals the quota. The count ends "when candidates to the number of seats to be filled have received a quota, . . . or when the number of continuing candidates is reduced to the number of seats still to be filled," such continuing candidates then being declared elected whether they have received the full quota or not.

Appellant contends that the charter provisions in question are in conflict with section 1, article II, of the state constitution, which provides that every qualified elector "shall be entitled to vote at all elections which are now or may hereafter be authorized by law." No one would contend that a law would be valid which deprived a qualified elector of the right to vote at an election. "In this country, the right to vote is recognized as one of the highest privileges of the citizen. It is so recognized not only by the citizen, but by the law; and any attempted infringement by legislative power upon that right as granted by the constitution is idle legislation." (*Spier* v. *Baker,* 120 Cal. 370, 375 [41 L. R. A. 196, 52 Pac. 659].) The constitutional right to vote would be a barren privilege if the legislature could limit its exercise to one office or one proposition to be voted on. The right to vote "at all elections" includes the right

to vote for a candidate for every office to be filled and on every proposition submitted. [1] The election of nine members of the city council is the election of persons to nine offices as fully as if the offices were distinct in name and in the duties to be discharged, and it is as far beyond the legislative power to limit the elector to the right of voting for one candidate therefor as it would be in the election of state or county officers. In *State* v. *Constantine,* 42 Ohio St. 437 [51 Am. Rep. 833], the statute under consideration authorized the election of four commissioners and provided that ''no elector shall at any election vote for more than two persons for such commissioners, and any ballot containing the names of more than two persons for said office shall not be counted for any of the names thereon, and the four persons receiving the highest number of votes shall be declared elected.'' The constitution provided that ''the election and appointment of all officers . . . not otherwise provided for by this constitution . . . shall be made in such manner as may be directed by law,'' and that every qualified elector ''shall be entitled to vote at all elections.'' In holding the statute unconstitutional, the court said: ''By this article we have no doubt that each elector is entitled to vote for each officer whose election is submitted to the electors, as well as on each question that is submitted.'' In the similar case of *McArdle* v. *Mayor etc. of Jersey City,* 66 N. J. L. 590, 88 Am. St. Rep. 496 [49 Atl. 1013], it is said: ''On its face, this act is plainly an infringement of that constitutional provision which secures to qualified voters the elective franchise.'' Like conclusions were reached in *State* v. *Bedell,* 68 N. J. L. 451 [53 Atl. 198], and *In re Opinion of Judges,* 21 R. I. 579 [41 Atl. 1009]. In apparent conflict with the foregoing authorities is the case of *Commonwealth* v. *Reeder,* 171 Pa. 505, 33 L. R. A. 141 [33 Atl. 67]. The statute there held constitutional directed the election of seven judges of the superior court and provided that ''no elector may vote . . . for more than six candidates upon one ballot for the said office.'' The constitution provided that every elector ''shall be entitled to vote at all elections.'' The act was upheld, by a divided court, on the ground that similar statutes in that state had been in force and undisputed for many years. In the majority opinion it is said that the construction therein given the constitu-

tional provision "was acquiesced in by the bar, the courts, and the legislature for a period of thirty-five years. . . . In view of this long-continued interpretation of our constitution, we do not think it necessary to discuss the authorities cited from other states." In view of the grounds on which the decision was based, the case cannot be considered authority where such grounds do not exist.

The statutes considered in the foregoing cases provided for minority representation by limiting the elector's right to vote. In furtherance of the same object, some states have provided for cumulative voting by allowing the elector to cast as many votes for one candidate as there are persons to be elected, or to distribute the same among the candidates as he may see fit. The constitution of Illinois so provides and, of course, the provision is upheld by the courts of that state. (*People* v. *Deneen*, 247 Ill. 289 [93 N. E. 437].) The constitution of this state provides for cumulative voting in the election of directors of corporations. (Const., art. XII, sec. 12.) In the absence of constitutional authorization, statutes permitting cumulative voting in public elections have been held invalid. (*Maynard* v. *Board of Canvassers*, 84 Mich. 228 [11 L. R. A. 332, 47 N. W. 756]; concurring opinion in *State* v. *Thompson*, 21 N. D. 426 [131 N. W. 231].) In *Maynard* v. *Board of Canvassers*, the court said: "No reason can be given why, under our constitution, one elector should be entitled to vote twice or seven times for any particular person to represent him in the legislature when any other elector who desires to exercise the right which the constitution gives him to vote for every person allowed by law to represent him in the legislature is permitted to vote but once. . . . It is no answer to say that he, too, may forego the right of an elector to vote for the number of representatives which the law permits in cities entitled to more than one representative; for to do so he is compelled to relinquish a constitutional right, and his right as an elector is in this respect abridged."

Preferential systems of voting have been upheld, where the elector is permitted to vote his first choice for as many candidates as there are offices to be filled, in the following cases: *Adams* v. *Lansdon*, 18 Idaho, 483 [110 Pac. 280], where the statute provided that electors must "vote for both first and second choice if there are more than twice as many candi-

dates as there are positions"; *State* v. *Nichols*, 50 Wash. 508 [97 Pac. 728], where the elector could cast as many first-choice votes as there were positions to be filled; *Farrell* v. *Hicken*, 125 Minn. 407 [L. R. A. 1915B, 401, 147 N. W. 815], where the statute provided that "no vote shall be counted on the election of commissioners unless the voters mark as many first choices as there are commissioners to be elected"; and *Orpen* v. *Watson*, 87 N. J. L. 69 [93 Atl. 853], where the statute provided for the election of five commissioners at large and required every elector to express a first choice for each office to be filled under penalty of having his ballot declared void.  In *State* v. *City of Portland*, 65 Or. 273 [133 Pac. 62], the city charter provided for the election of commissioners at large and that "when the number of candidates is more than three times the number of offices to be filled, each voter shall have the right to vote for as many first choice candidates as there are offices to be filled, and as many second choice candidates as there are offices to be filled, and as many third choice candidates as there are offices to be filled."  The system was upheld under a constitutional provision as follows: "Provisions may be made by law for the voter's direct or indirect expression of his first, second or additional choices among the candidates for any office."  A statute similar to the foregoing charter provisions of the city of Portland was held unconstitutional in *Brown* v. *Smallwood*, 130 Minn. 492 [Ann. Cas. 1917C, 474, L. R. A. 1916B, 931, 153 N. W. 953].  The court said: "The preferential system directly diminishes the right of an elector to give an effective vote for the candidate of his choice.  If he votes for him once, his power to help him is exhausted.  If he votes for other candidates he may harm his choice, but cannot help him. . . . A qualified voter has the constitutional right to record one vote for the candidate of his choice, and have it counted.  This right is not infringed by giving the same right to another qualified voter opposed to him.  It is infringed if such other voter is permitted to vote for three opposing candidates."  In *Wattles* v. *Upjohn*, 211 Mich. 514 [179 N. W. 335], the Hare system of voting, substantially as provided in the Sacramento charter, is declared unconstitutional.  The court said: "The Hare system limits his (the voter's) power to express his preference 'in this manner' to but one candidate

of the seven, only permitting him to express a second choice for one other, and so on by numerically dwindling and weakening choices until the elector has expressed thus 'as many choices as you (he) please.' As said in the Maynard case, 'It is not in the power of the legislature (nor a city adopting a charter under the Home Rule Act) to give his preference or choice, without conflicting with these provisions of the constitution, more than a single expression of opinion or choice'; and he has the right to express that single choice as to each of the officers to be elected in his district. While each voter can under the Hare system vote for all candidates to express sequential choices as provided, it is evident that his vote is primarily and positively effective for only one candidate." At the oral argument, counsel for respondents filed a typewritten copy of the decision of the court of appeals of the eighth district of Ohio, rendered May 6, 1922, in the case of *Reutener* v. *City of Cleveland,* upholding the Hare system as embodied in the Cleveland charter. The constitution of Ohio provides that all qualified electors shall be "entitled to vote at all elections." Section 3 of article XVIII of the constitution provides: "Municipalities shall have authority to exercise all powers of local self-government." Section 7 provides: "Any municipality may frame and adopt a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government." The court said: "A code city may become a charter city only by determining its desire so to do by electing a commission to frame a charter under the method provided by section 8, article XVIII, of the constitution, and by ratifying at an election the plans submitted to it by such commission. When it has so adopted a charter such city has become a self-governing municipality and is henceforth constitutionally qualified to make such changes as experience suggests and in such manner as is provided by section 9 of article XVIII. . . . If this fifth article of the constitution stood alone and was the sole measure of constitutional power in the case at bar the Constantine case might be deemed authoritative. The fifth article of the constitution, however, is not operative when it comes in conflict with article XVIII." The decision thus seems to be based upon the proposition that the chartered cities of Ohio are given the right of local

self-government in the broadest sense. The foregoing authorities uniformly sustain the declaration found in section 212 of McCrary on Elections, fourth edition, "that minority representation and cumulative voting can be provided for only by constitutional provision."

Respondents contend that chartered cities have been granted plenary authority to adopt the Hare system of voting by section 6 of article XI of the constitution, which empowers them "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters"; section 8 providing that such cities "may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters"; and section 8½, which provides: "It shall be competent in any charter framed in accordance with the provisions of this section, or section eight of this article, for any city or consolidated city and county, and plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several county and municipal officers and employees whose compensation is paid by such city or city and county, excepting judges of the superior court, shall be elected or appointed, and for their recall and removal."

It seems plain that sections 6 and 8 are inapplicable. They relate to the powers of chartered cities, *through their councils or by initiative measures,* to adopt "laws and regulations in respect to municipal affairs." The power of municipalities to adopt or amend charter provisions is not subject to "the restrictions and limitations provided in their several charters" any more than the power of the legislature to enact a law is limited by prior legislative acts, or than the power of the people to change the constitution is restricted by existing constitutional provisions. [2] Municipal authority to adopt the voting system in question must be found, if at all, in the provisions of section 8½. Since the authority conferred by section 8½ is made "subject only to the restrictions of this article" (article XI), it is pertinent to inquire what those restrictions are. Section 8 of article XI provides that a municipality "containing a popu-

lation of more than three thousand five hundred inhabitants . . . may frame a charter for its own government, consistent with and subject to this constitution.'' This restriction applies to and qualifies every power conferred upon the chartered city. Notwithstanding such restriction, however, if the municipality is given express authority by the constitution to do a particular thing contrary to some general provision thereof, ''the more specific provision controls the general.'' (*Martin* v. *Election Commrs.*, 126 Cal. 404, 411 [58 Pac. 932, 935].)

The right of qualified citizens to vote at all elections is the fundamental right upon which our government is founded. To justify a court in holding that the people of the state have surrendered or abridged that right, their intent to do so must appear with great certainty and clearness. In construing the constitutional provision under consideration, the forceful language of Chief Justice Marshall in *United States* v. *Fisher*, 2 Cranch, 358 [2 L. Ed. 304, see, also, Rose's U. S. Notes], is particularly applicable: ''Where rights are infringed, where fundamental principles are overthrown, where the general system of the laws is departed from, the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to effect such objects.''

The determination of the issue in this case must depend upon the construction of the provision of section 8½, empowering cities to provide in their charters for ''the manner in which'' and ''the method by which'' their officers shall be elected. In *Coffin* v. *Board of Election Commrs.*, 97 Mich. 188 [21 L. R. A. 662, 56 N. W. 567], the court said: ''The authority to direct the time and manner in which judicial officers shall be elected and the other officers elected or appointed does not involve the power to determine who shall constitute the electorate. The word 'manner,' it is true, is one of large signification, but it is clear that it cannot exceed the subject to which it belongs. It relates to the word 'elected.' The constitution had already provided for electors, and, when it provides that an officer shall be elected, it certainly contemplates an election by the electorate which it has constituted. No other election is known to the constitution, and, when it provides that the legislature may direct the manner in which an officer shall be elected, it simply

empowers the legislature to provide the details for the holding of such election." In *People* v. *English*, 139 Ill. 622 [15 L. R. A. 131, 29 N. E. 678], in construing a section of the constitution providing that "there may be a county superintendent of schools in each county whose qualifications, powers, duties, compensation, and time and manner of election and term of office, shall be prescribed by law," the court said that the word "manner" as used in the constitutional provision "indicates merely that the legislature may provide by law the usual, ordinary, or necessary details required for the holding of the election" and not that it may determine the qualifications of voters. The term "manner of election" has been given the same interpretation by other courts. (*Board of Election Commrs.* v. *Knight*, 187 Ind. 107 [117 N. E. 565]; *Livesley* v. *Litchfield*, 47 Or. 248 [114 Am. St. Rep. 920, 83 Pac. 142]; *People* v. *Guden*, 75 N. Y. Supp. 347; *State* v. *Adams*, 2 Stew. (Ala.) 231.) The word "manner" is more comprehensive than "method." Webster says: "Manner is literally the *handling* of a thing, and has a wider sense, embracing both *method* and *mode*." The addition of the word "method" by the amendment of 1914 cannot be held to have broadened the meaning of the word "manner" as used in section 8½. If the power given municipalities to provide for the manner of electing officers does not authorize them to prescribe the qualifications of voters, it cannot be held that it empowers them to deny electors the right to vote. Certainly, by the adoption of section 8½, the people have not "expressed with irresistible clearness" an intention to infringe and overthrow the fundamental right guaranteed by the constitution to every qualified elector of voting at all elections. Many authorities are cited to show that the election of municipal officers is a municipal affair, but none of them go to the extent of holding that the municipality can prescribe the qualifications of voters or abridge the constitutional right of qualified electors to vote.

Counsel for respondents say: "An examination of 'Debates and Proceedings of the Constitutional Convention of 1879,' is interesting in showing the intention of the framers thereof," and then proceed to set forth in their brief parts of such proceedings, showing an intent to give municipalities a large measure of local self-government. It is equally in-

teresting to examine the arguments for and against the adoption of the initiative amendment of 1914 to section 8½, containing the provisions on which respondents rely, and mailed to all the voters of the state, as required by law, shortly prior to the election of that year. The arguments were entirely silent as to the possibility of adopting a preferential or proportional representation system of voting under the provisions of the amendment, and it is fair to assume that the voters did not have such possibility in mind. At the same election there was submitted proposed Assembly Constitutional Amendment 19, amending section 13 of article XX, in which the following appeared: ''Provision may be made in such charters (of cities, counties or cities and counties), and by general laws in the case of other counties and municipalities, for either or both nomination for and election to office at a primary election of all or any portion of the candidates voted for at such primary election and for a preferential system of voting at any county, city and county, or municipal primary or other election. Provision for a preferential system of voting at any other primary election may also be made by general laws.'' Arguments in favor of the adoption of the proposed amendment were devoted exclusively to the merits of the preferential system but, notwithstanding the fact that no counter argument was made, the people defeated the proposed amendment by a large majority.

It would have been competent to provide in the charter for the division of the city into nine districts and the election of one member of the council from each district. Had that been done, no elector would have had a right to vote for more than one candidate to represent him. The Hare system cannot, however, be upheld on the theory that, in legal effect, it divides the electorate vote into as many districts or constituencies as there are offices to be filled, ''based on common opinion instead of arbitrary geographical lines,'' and that ''every man's ballot is counted for one man who is his representative among the candidates on the legislative body,'' which would be all he could do were the city divided into nine districts, and ''that therefore it cannot be said his right of elective franchise has been abridged.'' In *Wattles* v. *Upjohn, supra,* from which the foregoing quotations are made, the court said: ''Counsel very interestingly

discusses the advantages of that theoretical method of distributing constituencies by boundary lines of opinion, belief or policy, but, however alluring in theory, such intangible, undefined theoretical demarcation by similar thought or views is not a legal substitute for what is in law recognized to be a voting constituency or geographically defined representation district, as the right of franchise has become established under our constitution.''

Counsel for respondents argue that ''the right of defendants to hold office is justified also under the power of appointment.'' It seems so clear that the selection of the defendants was, and was intended to be, by election and not by appointment that it is deemed sufficient to quote the language of the court in *McArdle* v. *Mayor etc. of Jersey City, supra,* as follows: ''The argument of the counsel for the defendants in error that this is not an election, but an appointment by the legislature of persons to perform the duties of excise commissioners, who shall be selected in the manner pointed out by the act, if sound (which it is not), would enable the legislature to tamper with the elective franchise at its will, and the constitutional provision which was designed to secure to the qualified voters of the state the elective franchise would be made a nullity.''

It must be held that the proportional representation system of voting provided for in the charter is violative of the elector's constitutional right to vote at all elections. The power of the people of the state, by constitutional amendment, to authorize municipalities to adopt the Hare system of voting is not doubted, but it is clear that they have not done so. In reaching this conclusion, full consideration has been given to the principle that all laws are presumed to be constitutional and that they are to be declared invalid only when they clearly appear to be so. The court has also given consideration to the practical effect of holding the proportional representation system of voting unconstitutional. [3] Having been elected and acting under color of legal authority, the defendants were and are *de facto* officers whose official acts, within the scope of their authority as defined by the charter, are and will continue to be valid until they are legally deposed from office. It is fairly inferable from the allegations of the complaint that the members of the former city commission voluntarily surrendered their offices

at the time the new charter went into effect. If they did so and thereafter, for a period of three consecutive months, ceased to discharge the duties of their offices, the same became vacant. (Pol. Code, sec. 996; *People* v. *Hartwell,* 67 Cal. 11 [6 Pac. 873]; *People* v. *Rodgers,* 118 Cal. 393 [46 Pac. 740, 50 Pac. 668]; *People* v. *Rea,* 2 Cal. App. 109 [83 Pac. 165].) The affairs of the city will not be disturbed, other than such disturbance as may arise from a change of policies, if any, in the event that persons other than the defendants are selected to succeed them. Future elections of council members may be conducted under the general laws of the state, if the charter be not amended to provide a different procedure, section 2 of the charter providing that "where the general laws of the state provide a procedure for the carrying out and enforcement of any rights or powers belonging to the city, said procedure shall control and be followed unless a different procedure shall have been provided in this charter or by ordinance."

The judgment is reversed, with directions to the trial court to overrule the demurrer and grant the defendants a reasonable time to answer.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 22, 1922.

All the Justices present concurred.