## JOHN BROWN, Jr. v. W. H. SMALLWOOD.[1]

July 30, 1915.

Nos. 19,447—(259).

**Home Rule Charter — preferential voting.**

1. It was the intention of Laws 1913, c. 102, that the preferential system of voting for which provision was made in the Duluth Home Rule Charter of 1912, should apply to the election of the municipal judges of the city; and said act, though not passed by a two-thirds vote, legally provided an assistant judge, and a branch or division of the court, and fixed the terms of office and times of election of the judges and otherwise regulated the court and proceedings therein.

**Preferential voting — violation of Constitution.**

2. The preferential system of voting provided by the Duluth charter,

[1] Reported in 153 N. W. 953.

whereby first choice, second choice and additional choice, votes are permitted, and are counted in a manner therein provided, is unconstitutional as in contravention of article 7, section 1 and section 6, of the Constitution.

John Brown, Jr., a citizen and voter of the city of Duluth, gave notice of contest and appeal from the resolution of the city council of the city of Duluth acting as a canvassing board, by which it decided and certified that W. H. Smallwood was elected judge of the municipal court of that city for the term of four years, on the ground that more first choice votes were cast for William L. Windom than any other candidate at that election and that Windom having received the highest number of first choice votes was elected to that office. The respondent made answer and prayed that the contest be dismissed. The matter was heard before Cant, Dancer and Fesler, JJ., who made findings and ordered judgment, Cant dissenting, in favor of contestee. From the judgment entered pursuant to the order for judgment, contestant appealed. Reversed.

*Fryberger, Fulton & Spear,* for contestant.

*H. H. Phelps,* for respondent.


DIBELL, C.

At the general municipal election held in Duluth on the first Tuesday of April, 1915, the contestee, W. H. Smallwood, was a candidate for the office of municipal judge, and was declared elected by the city council. The contestant, John Brown, Jr., is an elector of Duluth, entitled to contest the election. On the hearing of the contest there were findings and judgment for the contestee. The contestant appeals from the judgment.

There are two questions:

(1) Whether the preferential system of voting provided by the Duluth charter applies to elections of the municipal judge.

(2) Whether the preferential system provided by the Duluth charter is constitutional.

1. It is contended that the municipal judge is a state officer and that for this reason the legislature did not intend his election by the preferential system. It is conceded that the municipal judge is a

state officer in certain senses of the term. State v. Fleming, 112 Minn. 136, 127 N. W. 473. In the case cited it was so held where there was an attempt to legislate an incumbent, a municipal judge under the general laws, out of office upon a change to a home rule charter. The municipal court is a state court within the meaning of Const. art. 6, § 1, providing that all inferior courts shall be established by the legislature by a two-thirds vote. The state does not pay the municipal judge. He is paid by the city of Duluth. The city furnishes him quarters. He is elected by the electors of the city. Const. art. 6, § 9. His jurisdiction is limited.

The Duluth Home Rule Charter of 1912 undertook to provide an assistant judge and a branch of the court in the territory known as West Duluth. The municipal court act was a special act. Sp. Laws 1891, p. 595, c. 53. It provided for a municipal judge and a special judge. The home rule charter of 1900 took no notice of the municipal court.

There was a well-founded doubt as to the constitutionality of the charter of 1912, insofar as it attempted to provide a branch court and create the office of assistant judge, or otherwise legislate as to the municipal court. By chapter 102, p. 107, Laws of 1913, approved March 24, 1913, which amended the original municipal court act of 1891, provision was made for a municipal judge, a special municipal judge, and an assistant municipal judge, with a branch of the court at West Duluth. It was provided that at the general municipal election, on the first Tuesday in April, 1913, there should be elected a successor to the then special judge, and at the same time an assistant municipal judge, both of whom should hold office for four years. It was provided that the municipal judge should be elected at the general election on the first Tuesday in April, 1915.

The act of 1913, for one thing, intended to put the constitutionality of the municipal court, and the provision for a branch court and a new judge, beyond doubt. It intended, further, to do away with annual elections, and make the election of the judges biennal to correspond with the biennial election system of the city. It was enacted March 24, 1913, and the general municipal election, to which it

referred, was on the first Tuesday in April following. We take judicial notice that in April, 1913, a special judge and an assistant municipal judge were elected under the preferential system; and the legislature, when it enacted the act of March 24, 1913, providing for their election, knew of the general municipal election to be held in the following April under the preferential system, and knew that there was no law, except that provided by the charter, under which an election could be had. There was no time for a primary under the general law prior to the election and no method of putting candidates before the people, except by the preferential system which the city had provided.

We are of the opinion that it was the intention of the legislature that, commencing with 1913, the three judges for whom provision was then made should be elected at the general municipal election of Duluth, in the manner provided for elections by the charter. The election was a local one, of no particular concern to the rest of the state, and there was no reason why it should not be conducted by the local machinery. There was every reason why it should intend to avoid annual elections, or a primary for the judges alone, and afterwards an election either by a separate ballot or by a ballot combined with the preferential ballot. The fact that the election was of a judge is, in itself, of no significance. If the preferential system of voting was constitutional, there is no reason why it should not be applied to the judges. There is nothing peculiarly sacred about the method of their election and by chapter 102 the legislature manifested no intent that a different method of election should be accorded them. If a preferential election was good for commissioners, it was not necessarily bad for judges. We think the court was right in holding that the preferential system was intended; and if constitutional the apparent result of the election is right.

In speaking of the effect of Laws 1913, p. 107, c. 102, we have not overlooked article 6, § 1, of the Constitution, requiring that all inferior courts must be established by a two-thirds vote, nor have we neglected to notice that chapter 102 was not enacted by such a vote. All objection to the lack of such vote is answered by Dahlsten v. Anderson, 99 Minn. 340, 109 N. W. 697.

2. The next question is whether the preferential system of voting, for which provision is made in the Duluth charter, is constitutional.

The general scheme of the preferential system is this:

All candidates go upon the official ballot by petition. The ballot provides for first choice, second choice and additional choice, votes. If the result of the first choice is a majority for a candidate, he is elected. If a count of the first choice votes brings no majority, the second choice votes are added to the first choice votes, and if a candidate then has a majority of the first and second choice votes, he is elected. If there is not a majority, the first and second choice votes are added to the additional choice votes, and the candidate having a plurality is elected. Each voter may vote as many additional choice votes as he chooses, less the first and second choice votes; that is, he may vote as many additional choice votes as there are candidates, less two. In this case, there were four candidates, each voter had two additional votes, or a total of four votes. No voter can vote more than one vote for any one candidate. He is not required to vote a second choice or additional choices. The following is the official ballot used at the election:

### MUNICIPAL BALLOT.

General Municipal Election, City of Duluth, April 6th, 1915.

#### INSTRUCTIONS.

To vote for any person mark a (x) in the square in the appropriate column according to your choice at the right of the name voted for.

Vote your first choice in the first column.

Vote your second choice in the second column.

Vote for all other candidates which you wish to support in the third column.

Vote 2 first choices for Commissioners or ballot will be void as to Commissioners.

Don't vote more than one choice for any candidate as only one choice will count for any candidate.

Any distinguishing mark makes the ballot void.

If you wrongly mark, tear or deface this ballot return it and obtain another from the election officers.

| FOR COMMISSIONERS. Vote two (2) first choices or ballot will be void as to Commissioners. | First Choice. | Second Choice. | Additional Choices. |
|---|---|---|---|
| William L. Bernard ...................... | .......... | .......... | .......... |
| Chris E. Lewis ........................... | .......... | .......... | .......... |
| James A. Farrell ........................ | .......... | .......... | .......... |
| W. A. Hicken ............................ | .......... | .......... | .......... |
| R. E. McFarlane ......................... | .......... | .......... | .......... |
| Roderick Murchison ..................... | .......... | .......... | .......... |
| Jas. L. Norman ......................... | .......... | .......... | .......... |
| Bernard Silberstein .................... | .......... | .......... | .......... |
| ....................................... | .......... | .......... | .......... |
| ....................................... | .......... | .......... | .......... |
| FOR JUDGE OF MUNICIPAL COURT. Vote for one only on first choice. Vote for one only on second choice. | First Choice. | Second Choice. | Additional Choices. |
| M. E. Louisell .......................... | .......... | .......... | .......... |
| John H. Norton ......................... | .......... | .......... | .......... |
| W. H. Smallwood ....................... | .......... | .......... | .......... |
| William L. Windom ..................... | .......... | .......... | .......... |
| ....................................... | .......... | .......... | .......... |
| ....................................... | .......... | .......... | .......... |

The following tabulation shows the result of the election of municipal judge.

| | First Choice. | Second Choice. | 1st & 2nd Choice. | Add'l Choice. | 1st, 2nd & Add'l Choice. |
|---|---|---|---|---|---|
| Louisell ........ | 992 | 734 | 1,726 | 402 | 2,128 |
| Norton ......... | 3,417 | 1,501 | 4,918 | 167 | 5,085 |
| Smallwood ..... | 3,496 | 2,845 | 6,341 | 240 | 6,581 |
| Windom ........ | 4,408 | 604 | 5,012 | 54 | 5,066 |
| Totals ........ | 12,313 | 5,684 | 17,997 | 863 | 18,860 |

There was no majority of first choice votes. There was no majority of first and second choice votes. There was of course a plurality of first choice, second choice, and additional choice, votes.

The Constitution provides as follows:

"Every male person of the age of twenty-one years or upwards * * * shall be entitled to vote at such election * * * for all officers that now are or hereafter may be, elective by the people." Const. art. 7, § 1.

130 M.—32.

There is this further provision:

"All elections shall be by ballot, except for such town officers as may be directed by law to be otherwise chosen." Const. art. 7, § 6.

When the Constitution was framed, and as used in it, the word "vote" meant a choice for a candidate by one constitutionally qualified to exercise a choice. Since then it has meant nothing else. It was never meant that the ballot of one elector, cast for one candidate, could be of greater or less effect than the ballot of another elector cast for another candidate. It was to be of the same effect. It was never thought that with four candidates one elector could vote for the candidate of his choice, and another elector could vote for three candidates against him. The preferential system directly diminishes the right of an elector to give an effective vote for the candidate of his choice. If he votes for him once, his power to help him is exhausted. If he votes for other candidates he may harm his choice, but cannot help him. Another elector may vote for three candidates opposed to him. The mathematical possibilities of the application of the system to different situations are infinite.

Naturally enough we have little direct authority upon the constitutionality of this method of voting. In some states cumulative or restrictive voting is allowed by the Constitution. When the voting is cumulative, and there are sufficient candidates, the voter votes for as many candidates as there are offices to be filled, or votes all his votes for one candidate, or otherwise distributes them. Under the restrictive system he is permitted to vote for only a portion of the candidates to be elected, for instance, for two when there are four offices to be filled. Cases under these systems are of some present value. In Illinois the Constitution provides for cumulative voting. Const. art. 4, § 7. This is a right which the legislature may not interfere with under the Illinois Constitution, and the voter has the constitutional right to cumulate his votes. Rouse v. Thompson, 228 Ill. 522, 81 N. E. 1109; People v. Deneen, 247 Ill. 289, 93 N. E. 437. Attempts have been made to provide for cumulative voting by legislation without direct constitutional authority. An account of one such attempt is given in Maynard v. Board of Canvassers, 84 Mich. 228, 47 N. W. 756, 11 L.R.A. 332. It was held unconstitutional. The court said:

"The Constitution is the outgrowth of a desire of the people for a representative form of government. The foundation of such a system of government is, and always has been, unless the people have otherwise signified by their constitution, that every elector entitled to cast his ballot stands upon a complete political equality with every other elector, and that the majority or plurality of votes cast for any person or measure must prevail. * * * It is the constitutional right of every elector, in voting for any person to represent him in the legislature, to express his will by his ballot; and such vote shall be of as much influence or weight in the result, as to any candidate voted for, as the ballot and vote of any other elector. The Constitution does not contemplate, but by implication forbids, any elector to cast more than one vote for any candidate for any office. The prohibition is implied from the system of representative government provided for in that instrument. * * * Giving to the language of the Constitution its ordinary signification, it declares the principle that each elector is entitled to express his choice for Representative, as well as all other officers, which is by his vote, and the manner of expressing such choice is by ballot. When he has expressed his preference in this manner, he has exhausted his privilege; and it is not in the power of the legislature to give to his preference or choice, without conflicting with these provisions of the Constitution, more than a single expression of opinion or choice. * * *"

In State v. Thompson, 21 N. D. 443, 131 N. W. 239, there was involved the cumulative voting for commissioners under a commission form of city government. There was language in the statute easily susceptible of the construction that cumulative voting was intended. The court, with effort, held that the statute did not contemplate cumulative voting. Mr. Justice Fisk dissented, holding that cumulative voting was intended, and that the statute was unconstitutional, adopting the views of the Maynard case, supra. Mr. Justice Spalding, while concurring in the opinion, held that, if the statute provided for cumulative voting, it was unconstitutional. In the course of his opinion he said:

"Our system of government is based upon the doctrine that the

majority rules. This does not mean a majority of marks, but a majority of persons possessing the necessary qualifications, and the number of such persons is ascertained by the means of an election."

In the case at bar it may be noted that the number of persons who voted were 12,313, and the number of cross marks considered on the plurality election were 18,860. It was not a voting of man against man.

In State v. Constantine, 42 Oh. St. 437, 51 Am. Rep. 833, the statute under consideration authorized the election of four members of the police board, but denied to an elector the right to vote for more than two members. This was held unconstitutional. The court said:

"No such thing as 'minority representation' or 'cumulative voting' was known in the policy of this state at the time of the adoption of this Constitution in 1851. The right of each elector to vote for a candidate for each office to be filled at an election had never been doubted. No effort was made by the framers of the Constitution to modify this right, and we think it was intended to continue and guarantee such right by the provision that each elector 'shall be entitled to vote at all elections.' "

In Opinion to the House of Representatives, 21 R. I. 579, 41 Atl. 1009, a like opinion was given by the justices. The same holding was made in McArdle v. Jersey City, 66 N. J. Law, 590, 49 Atl. 1013, 88 Am. St. 496, and Bowden v. Bedell, 68 N. J. Law, 451, 53 Atl. 198.

Attention is called to some cases involving primary elections where departures from what seemed to be mandates of the Constitution have been upheld. Usually it will be found that the courts upheld them upon the ground that primary elections are not elections within the Constitution. This is likely true of Adams v. Lansdon, 18 Idaho, 483, 110 Pac. 280; and is certainly true of State v. Nichols, 50 Wash. 508, 97 Pac. 728; upon which the Idaho case seems to rest. In referring to these two and other cases, the supreme court of Tennessee, in Ledgerwood v. Pitts, 122 Tenn. 570, 595, 125 S. W. 1036, said that the decisions in such cases were rested upon the prop-

osition "that such primaries are not in reality elections, but merely nominating devices."

Our own court has made a distinction between provisions which might not be fatal in primary statutes, which would be fatal in election statutes. In State v. Johnson, 87 Minn. 221, 91 N. W. 604, 840, Mr. Justice Lewis, in referring to a primary election, said:

"If the election of candidates to the position of nominees is an election within the meaning of article 7 of the Constitution, then the primary law, as above construed, is unconstitutional. It would, in certain cases, deprive the voter of his privilege to exercise the elective franchise."

And in State v. Erickson, 119 Minn. 152, 137 N. W. 385, Chief Justice Start said that "statutory regulations applicable only to a primary election, which might be repugnant to the Constitution if extended to elections, are not necessarily invalid."

The quotations made from the different cases are not chance expressions. They are indicative of the idea, which permeates all legal thought, that when a voter votes for the candidate of his choice, his vote must be counted one, and it cannot be defeated or its effect lessened, except by the vote of another elector voting for one. A qualified voter has the constitutional right to record one vote for the candidate of his choice, and have it counted one. This right is not infringed by giving the same right to another qualified voter opposed to him. It is infringed if such other voter is permitted to vote for three opposing candidates.

We know of but two cases involving the preferential system. One is State v. Portland, 65 Ore. 273, 133 Pac. 62. The Constitution of Oregon distinctly authorizes such system and it is of course valid. The other is Orpen v. Watson (N. J.) 93 Atl. 853. The court there reached a conclusion directly opposed to our views. We have given it full consideration. It does not accord with our views, and we do not follow it.

Men of serious purpose have given thought to the preferential and other systems of voting, and are of the opinion that the prevailing system of voting by ballot is not effective. Some of the various systems are referred to in the Maynard case, supra, McCrary,

Elections, note pp. 158–162; Sixty-third Cong. Sen. Doc. 142, 359; and the libraries are replete with contemporaneous literature treating of the subject. We have no quarrel with them. Our concern is with the constitutionality of the act before us and not with the goodness of other systems or with defects in our own.

We are making no narrow construction of the Constitution. In Elwell v. Comstock, 99 Minn. 261, 109 N. W. 113, 698, 7 L.R.A. (N.S.) 621, 9 Ann. Cas. 270, the constitutionality of a statute authorizing voting by machine instead of by ballot was upheld. Mr. Justice Brown, the present Chief Justice, said:

"Constitutions are not made for existing conditions only, nor in the view that the state of society will not advance or improve, but for future emergencies and conditions, and their terms and provisions are constantly expanded and enlarged by construction to meet the advancing and improving affairs of men."

There the purpose was to use a machine which answered all the purposes of the Constitution—secrecy and a correct count. It was another method of reaching a correct result. Here the purpose is to adopt a different plan of voting, necessarily affecting what we think to be the clearly granted constitutional rights of the citizen. If the preferential system is adopted, it must be after a constitutional sanction by the people.

It is fair to say that the question of the constitutionality of the preferential vote was not suggested to the trial judges; and their attention was asked only to the point first made.

Judgment reversed.

HALLAM, J. (dissenting in part).

I dissent from the second proposition stated in the opinion.

The constitutional question is, does this system of preferential voting violate the constitutional guaranty of a right "to vote" at an election "for all officers * * * elective by the people?" Const. art. 7, § 1. The question is a new one in this state. It was not considered in Farrell v. Hicken, 125 Minn. 407, 147 N. W. 815.

This charter was drafted by a commission appointed pursuant to the provisions of the Constitution and statutes of the state, and

was adopted by the people of Duluth. It is legislation and as legislation it is to be enforced unless its unconstitutionality appears beyond a reasonable doubt. Curryer v. Merrill, 25 Minn. 1, 33 Am. Rep. 451; Lommen v. Minneapolis Gaslight Co. 65 Minn. 196, 208; 68 N. W. 53, 33 L.R.A. 437, 60 Am. St. 450. The membership of the commission embraced lawyers of recognized ability. This court has entertained three election contests prior to this one, all of them arising out of the first election under this charter. Farrell v. Hicken, 125 Minn. 407, 147 N. W. 815; McEwen v. Prince, 125 Minn. 417, 147 N. W. 275; Silberstein v. Prince, 127 Minn. 411, 149 N. W. 653. All were conducted with ability. In one case McEwen and Prince, and in another Silberstein and Prince, contended for the office of mayor. In both cases Prince was solemnly declared elected. None of these men had a majority or even a plurality of first choice votes. If the majority opinion in this case is right none of them had a semblance of a right to the office. They were all "fighting windmills." In the McEwen case another candidate, Fay, with the highest number of first choice votes, presented in the trial court the claims sustained by the majority opinion in this case. The decision was against the contention, and Fay timidly submitted and did not follow the other contestants to this court. In Farrell v. Hicken, too, this contention was presented in the trial court. Here also if sustained its application would have been decisive against the contestee. It was not sustained in the trial court and it was abandoned by the able counsel for contestant on appeal to this court. In this case I have looked in vain through the record as made in the trial court for any suggestion that there was any constitutional question in the case. Of course no one of these facts, nor all of them together, are decisive of the constitutionality of this legislation, but this train of circumstances, of *nisi prius* decisions deliberately acquiesced in, and of positions deliberately taken by able lawyers, should cause this court to exercise much caution before holding that these positions all voluntarily abandoned were safe beyond a reasonable doubt. No voter of Duluth has ever complained of restriction of his right to vote or of any advantage, real or supposed, of any other voter. The only complaint has come from those

who claim the right to be voted for in a particular way. This is not decisive, but it is significant. Neither is there anything decisive in the fact that if this decision is right Duluth has, all the time since this charter went into effect, lived its municipal existence under a *de facto* mayor, and, for part of the time at least, under *de facto* councilmen. Yet these conditions, generally acquiesced in for more than two years, are entitled to some thought in coming to a conclusion upon the crucial question in the case, the constitutionality of this election law.

Many reasons might be given why this legislation should not have been passed by the people of Duluth. With its wisdom we are not concerned. The only question is whether this community had the constitutional right to adopt this plan of election. The authorities elsewhere are few, but they are in favor of the constitutionality of this law.

Orpen v. Watson, (N. J. Sup.) 93 Atl. 853, is directly in point. Adams v. Lansdon, 18 Idaho, 483, 110 Pac. 280, presented a similar situation, except that the case involved a primary election. Had the court been of the opinion that the provisions of the Constitution of that state as to elections do not apply to primary elections, it might have disposed of the case on that ground. It did not do so. Perhaps it entertained the same opinion as some other courts (Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L.R.A. 196; The People v. Election Commrs. 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562), that the constitutional provisions as to elections do apply to primary elections. At any rate it so treated the case. The court recited the contention made that the second choice feature was violative of the provision of the Constitution which forbids any power, civil or military, to "interfere with or prevent the free and lawful exercise of the right of suffrage" in that it would "interfere with or prevent the free and lawful exercise of the right of such voter." And it holds that the enactment of the second choice feature was "a reasonable exercise of the power of the legislature" to make regulations in regard to the conduct of elections and the exercise of the right of suffrage, and that it did not unreasonably interfere with the freedom of the elector in exercising that right.

State v. Nichols, 50 Wash. 508, 527, 528, 97 Pac. 728, 733, also involved a primary election. In one part of the opinion it is said that the constitutional provision as to qualification of voters does not apply to primary elections, but in discussing the second choice provisions of the statute no such distinction is drawn. The court, pages 527, 528, says:

"The principal argument against the second choice provision is that it interferes with the freedom of election guaranteed by the Constitution and compels the elector to vote for a person other than the candidate of his choice. This contention is untenable. The elector has the utmost freedom of choice in casting his first choice ballot, though his choice will not avail him unless at least forty per centum of his party agree with him. It was entirely competent for the legislature to provide that a candidate receiving less than forty per centum of his party vote should not be deemed its nominee, and with such a provision in the law it was incumbent on the legislature to provide some other method of nomination whenever a candidate failed to receive the required vote at the primary."

Statutory provisions giving voters the option to cumulate their votes upon less than the whole number of candidates to be elected have been held valid under constitutional provisions similar to our own. People v. Nelson, 133 Ill. 565, 596, 27 N. E. 217. This case distinguishes cases like State v. Constantine, 42 Oh. St. 437, 51 Am. Rep. 833, decided under a statute denying the right to vote for as many candidates as there are persons to be elected. The Illinois Constitution permits cumulative voting for legislative officers, but there is not in the Constitution of Illinois any provision authorizing cumulative voting in elections of the kind considered in the case cited. The Pennsylvania court sustained a statute limiting the right to vote for six candidates where seven were to be elected, and declined to follow State v. Constantine. The same question was raised under a statute in New York. In one case it was said, the question is "a very grave and interesting one." People v. Kenney, 96 N. Y. 294, and in another case it was said to be a question "about which there is room for difference and debate." People v. Crissey, 91 N. Y. 616. We need not go so far as the Illinois and Pennsyl-

vania courts have gone. For purposes of this case it may be conceded that no voter can give more than one vote for any candidate. The legislation before us does not do this.

The guaranty of the Constitution of this state that every male person a citizen of the United States "shall be entitled to vote" at an election "for all officers * * * elective by the people," had at the time of its adoption only one meaning. At the time the Constitution was adopted there was restricted suffrage in many states. In some there were racial disqualifications, and in others property and educational qualifications. My opinion is that the framers had in mind only the matter of defining what persons should be entitled to vote. The debaters in both constitutional conventions make this clear. They intended to guarantee to the persons named in the Constitution the right to vote, and the same right to vote as every other elector. Methods of voting never entered their minds, and they never supposed they were prohibiting any method of election which did not deny equality of right among voters. The provision should be so construed as to give effect to their purpose. Whatever the Duluth charter does do, it does not infringe on the right to vote. Every citizen has the same right as every other citizen. The thought running through all the decisions is that the right to vote is a political privilege which the legislature may regulate to any extent not prohibited by the state or Federal Constitution. "Whether such regulation be reasonable or unreasonable is for the determination of the Legislature, and not for the courts, so long as such regulation does not become destruction." Common Council v. Rush, 82 Mich. 532, 46 N. W. 951, 10 L.R.A. 171. As said by Elkin, J., in Winston v. Moore, 244 Pa. St. 447:

"In a general way it may be said that elections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him."

Under our system of government, where every voter has a right to run for office, and where the number of candidates is often large, it is not practicable or wise to settle the right to office by a single ballot of first choice votes and to give a certificate of election to the candidate receiving the highest number of first choice votes. Even the highest may sometimes receive but a small fraction of the total vote. The common method of elimination is now by means of a primary election. The people of Duluth proposed to dispense with the machinery of an extra primary election and to accomplish the same result by permitting an expression of second and additional choice votes all at once. Without regard to the merits of their plan, it appears to me that the plan was within their constitutional power to adopt. No voter has a constitutional right to say that his candidate shall be declared elected without a majority of first choice votes, and, if such candidate receives less, the voter who supports him has no constitutional right to say that the election shall be void and no further expression of the electorate shall be received. In my opinion the voters of Duluth did not, by the adoption of their charter, infringe upon their "own" right "to vote."

On August 27, 1915, the following opinion was filed:

PER CURIAM.

The contestee petitions for a rehearing. The city of Duluth, though not a party, asks for a rehearing, to the end, we take it, that it may appear as a friend of the court and file a brief or make an argument if a rehearing is granted. We treat its petition as one proper to be considered.

It is not suggested that there has been a failure to bring any fact to the attention of the court; nor that there are other pertinent authorities which might be cited; nor that arguments which might have been made were omitted; nor that anything new bearing upon the case is at hand. Indeed, the claim is that the court went wrong upon a plain proposition involving no difficulty; or, to put it in the language of one of the petitions, "If one will put the proposition up to good lawyers, * * * who have examined into the question,

five out of six will say that the statute does not violate the Constitution." With the viewpoint of the petitioners in mind, we have re-examined the one question here important, viz., the constitutionality of the preferential system of voting used in the election of the municipal judge.

In reaching our decision we proceeded studiously and with deliberation, and conformably to the settled policy of this court in favor of a liberal construction of the Constitution. It is serious to declare a piece of legislation unconstitutional. It is a matter for deliberate consideration when it is seriously asserted that a piece of legislation impairs the constitutional right of suffrage of a citizen. We reached the conclusion that a system of voting, giving the voter the right to vote for the candidate of his first choice, and against the first choice of another voter, and, in addition, by a manipulation of second and additional choice votes, vote for different candidates all against the first choice of such other voter to a number of times limited only by the number of candidates, was contrary to the intent of the Constitution; and that it was none the less so because such other voter was permitted to engage in a like manipulation of second and additional choice votes. Our further examination confirms us in our view. The decision is sound; and we do right in upholding the right of the citizen to cast a vote for the candidate of his choice unimpaired by second or additional choice votes cast by other voters.

Since nothing has been overlooked and there is nothing new to be presented and upon a re-examination we are confident of the correctness of our decision, a rehearing should not be granted. We respect the opinions of others, those who framed the charter and those who have thought upon it, but our own judgment, reached after much labor and deliberation, and with the aid of the arguments of able counsel, must determine the decision as in other cases; and the fact, evident when the opinion was written, and made prominently plain in both petitions, that the decision is unpopular, had no consideration when the decision was reached and receives none upon the petitions for a rehearing.

Perhaps all has been said that need be; but it is claimed that con-

fusion has come because of the decision, and, if so, we should help in its elimination so far as we properly can; and it is proper enough to remark upon some of the grounds urged for a rehearing for they are properly before us.

The petition says:

"Necessarily untold litigation will arise over salaries of officers, title to office, and the effect of official acts. Claims are already made by different parties for the same salary and the city knows not who to make payment to. As to the status of the city government, and the powers and rights of its officials opinions among lawyers even are almost as divergent as the number of lawyers at the bar. The credit of the city is liable to be seriously affected by this decision. * * * The result is that bankers are already expressing the fear that the obligations of the city created since the adoption of the present charter are invalid."

It is further suggested that certificates of indebtedness issued by the city and assessments for public improvements will be affected. It is suggested that one or more commissioners, holding under the 1913 election, are without title under the late decision; that the acts of the commissioners may be held invalid; that the right to hold office may still be involved in judicial investigation; and that the city may be involved in litigation for salaries of officers claiming to have been elected though they never entered office.

We assume that these suggestions are seriously made. They are easily answered. The decision does not invite, nor require, nor permit, the city to disavow its obligations. The credit of the city is not affected. The time for contest of the results of the 1913 election has gone. It is hard to imagine a case where a court would give one searching office a remedy by *quo warranto*. The acts of the commissioners holding and exercising office are valid. Public improvements or assessments for them are in no wise affected. The government of the city is not gone. Its commission form of government is still with it. No calamity has befallen the city. The commissioners holding office under the 1913 election are just as truly commissioners as if they had been elected under another system of voting. There is no reason for confusion. There may be litigation.

Anyone may commence a lawsuit. But all these grounds suggested in support of the petitions for a rehearing are without merit and tend only to suggest a fanciful basis for fruitless litigation.

Complaint is made that the opinion fails to advise the city of the various complications which may arise in the future. We do not see them. We do not know that there will be any or why there should be. The only question brought to us was whether the contestee was elected municipal judge and it arose upon a contest instituted by an elector and not by a candidate for the office. We can decide no questions not involved in the broad question stated. The appeal was from the judgment adjudging the contestee elected. The judgment was reversed. The law fixes the effect of a reversal.

Petitions for rehearing denied.