WATTLES, *ex rel.* JOHNSON, *v.* UPJOHN.

1. MUNICIPAL CORPORATIONS—KALAMAZOO CHARTER — ELECTIONS— CONSTITUTIONAL LAW—PROPORTIONAL VOTING.

The provisions of the charter of the city of Kalamazoo (sections 41a, 182, 183), adopted under the "home rule" act, providing substantially for the use of the "Hare system" of proportional and preferential voting in the election of city commissioners, are in contravention of section 25, Art. 8, of the Constitution of Michigan, which provides that "no city or village shall have power to abridge the right of elective franchise."

2. SAME—PARTIAL INVALIDITY—ELIMINATION.

Where, after eliminating the sections which contain all the objectionable election features, a complete, practical charter, including independent, workable election provisions, yet remains, the whole charter will not be held void.

3. SAME—QUO WARRANTO—MOOT QUESTION—REVIEW.

Where the information in the nature of *quo warranto* was filed by the prosecuting attorney on the relation of an alderman whose office was abolished by the charter, but it is stated in the information that it was not alone founded upon plaintiff's right to office, but also as a citizen

and taxpayer, and upon the right of the people to test the right of defendant commissioners to hold office under the charter, the Supreme Court in reviewing the proceedings will not pass upon plaintiff's right to the expired term of an abolished office, which has become a moot question.

4. SAME—DE FACTO OFFICERS—VALIDITY OF ACTS.

Defendants and all other city officers legally nominated and formally found elected under color of the voting system provided in the charter, who qualified and acted as such, were and are *de facto* officers whose official actions within the scope of the charter are valid until they are legally deposed.

Error to Kalamazoo; Root (Jesse H.), J., presiding. Submitted April 27, 1920. (Docket No. 100.) Decided September 30, 1920.

*Quo warranto* by Stephen H. Wattles, prosecuting attorney, on the relation of William H. Johnson, against William E. Upjohn and others to try the title to the offices of commissioners of the city of Kalamazoo. Judgment of ouster. Defendants bring error. Affirmed.

*Marvin J. Schaberg,* for appellants.

*Mason & Sharpe,* for appellee.

*Thomas R. White* and *Albert B. Maris, amici curiae.*

STEERE, J.   The primary purpose of this proceeding, as emphasized in the arguments and briefs of counsel, is to test the validity of the voting system for electing members of the governing body of the city of Kalamazoo under a recently adopted charter. The motives which are somewhat discussed we regard as wholly immaterial. The controversy was brought before the circuit court of Kalamazoo county by an information in the nature of *quo warranto* filed by the prosecuting attorney on the relation of one Johnson, an alderman of the city under its preceding charter,

against the mayor and commissioners elected pursuant to the provisions of the present charter, to test their right to such offices. It is also contended that the proceeding resultantly involves the validity of the entire present charter of the city. Counsel for plaintiff concede defendants were "regularly elected as commissioners in so far as their election could be regular under this charter."

From 1838 to 1883 Kalamazoo was incorporated as a village. In the latter year it was incorporated as a city. From then until 1918 it continued as a city incorporated under special acts of the legislature. In February, 1918, the electors adopted a new charter under the so-called home rule provisions of the Constitution and supplemental legislation. Details of proceedings to that end need not be reviewed, as it is conceded all prescribed steps leading up to the adoption of the present charter were regularly taken, and that in so far as a charter could be legally adopted with the claimed invalid provisions in it, every requirement has been fully complied with.

At the provided April election which followed adoption of the present charter by electors of the city, defendants were elected city commissioners, superseding the board of aldermen and mayor who up to that time constituted the governing body of the city under its old charter. Plaintiff Johnson was then a member of the board of aldermen, and deposed before the term for which he was elected expired by the newly elected city commissioners when they qualified and assumed their duties under the new charter.

While several other more or less technical questions were raised in the pleadings, counsel for appellants states the two questions to be decided are:

"*First.* Is the provision of the new charter, which provides for the election of commissioners by the proportional representation system contained therein, unconstitutional?

"*Second.* If so, does that render the entire charter unconstitutional?"

Plaintiff's contention before the circuit court and here is that the system of electing commissioners provided in the charter is unconstitutional because—

"(*a*) The elector is deprived of the right to vote for every office to be filled.

"(*b*) The elector is not protected in his right to voting power equal to that of every other elector."

The provisions of the Constitution which it is claimed this voting system contravenes are section 1 of article 3 which under the heading "Elective Franchise" provides, so far as applicable here:

"In all elections every * * * (defining at length qualified voters) shall be an elector entitled to vote." * * *

And the provision in section 25, article 8, under the heading "Cities and Villages" which provides that—

"No city or village shall have power to abridge the right of elective franchise, to loan its credit, etc."

The charter adopts the general laws of the State relative to the registration of voters, nominations and elections, "except as herein otherwise provided."

Section 35 recognizes as qualified electors all inhabitants of the city "having the qualifications of electors under the Constitution and general laws of the State," and section 41, on the "Conduct of Elections," introduces the system of voting in controversy as follows:

"(*a*) The members of the city commission shall be elected by. the proportional representation system. The form of the ballots, the method of conducting elections and the rules for counting the ballots shall be governed by ordinance to be enacted by the city commission, which ordinance shall contain all the provisions relating thereto hereinafter prescribed in the schedule to this charter."

Whether any ordinance following the "schedule" was

ever enacted does not appear, but section 181 returns to the subject and provides that "The first election of officers under this schedule shall be held on the first Monday in April, 1918," specifies officers to be elected, etc., and section 182 prescribes rules for the first and succeeding elections under "this schedule," directs how ballots shall be printed with names of candidates "rotated" and directions to voters at top in part as follows:

"Put the figure 1 opposite the name of your first choice, do so by putting the figure 2 opposite the name of your second choice, the figure 3 opposite the name of your third choice, and so on. Express thus as many choices as you please."

It may perhaps be assumed, in the absence of further mention, that the schedule foreshadowed in previous sections materializes in section 183, which, under the heading "Rules for Counting Ballots," enlarges upon the subject in a series of directory and explanatory paragraphs from (a) to (t) inclusive, which may be said to furnish the groundwork for this litigation. The commissioners who prepared this charter for submission to the electors state in their explanatory foreword "to the voters of Kalamazoo," that it had been the aim and policy of the commission "to write this charter so that the fundamental laws of the city will be brief, simple and understandable to all. In carrying out this policy all detail and immaterial matter has been excluded."

Whether that portion of the fundamental law of the city found in section 183 is simple and understandable to all, and whether if applied as it should be understood the result is constitutional, are debated issues of importance, and to approximate an understanding of the controversy it seems advisable, inasmuch as "all detail and immaterial matter has been "excluded," to quote the section in full, as follows:

"SECTION 183. Ballots cast for the election of members of the city commission shall be counted and the results determined by the central election board according to the following rules:

"(*a*) On all ballots a cross shall be considered equivalent to the figure 1. So far as may be consistent with the general election laws, every ballot from which the first choice of the voter can be clearly ascertained shall be considered valid.

"(*b*) The ballots shall be first sorted and counted at the several voting precincts according to the first choices of the voters. At each voting precinct the ballots cast for each candidate as first choice shall be put up in a separate package which shall be properly marked on the outside to show the number of ballots therein and the name of the candidate for whom they were cast. The ballots declared invalid by the precinct officials shall also be put up in a separate package, properly marked on the outside. All the packages of the precinct, together with a record of the precinct count, shall be forwarded to the central election board as directed by it and the counting of the ballots shall proceed under its direction.

"(*c*) First choice votes for each candidate shall be added and tabulated. This completes the first count.

"(*d*) The whole number of valid ballots shall then be divided by a number greater by one than the number of seats to be filled. The next whole number larger than the resulting quotient is the quota or constituency that suffices to elect a member.

"(*e*) All candidates the number of whose votes on the first count is equal to or greater than the quota shall then be declared elected.

"(*f*) All votes obtained by any candidate in excess of the quota shall be termed his surplus.

"(*g*) The surpluses shall be transferred, the largest surplus first, then the next largest, and so on, according to the following rules:

"(*h*) Ballots capable of transfer up to the number of votes in the surplus shall be successively transferred to the continuing candidates marked on them as next choice. The particular ballots to be taken for transfer as the surplus of a candidate shall be obtained by taking as nearly an equal number of ballots as possible from the ballots capable of transfer that

have been cast for him in each of the different precincts. All such surplus ballots shall be taken as they happen to come without selection.

"(*i*) 'Ballots capable of transfer' means ballots from which the next choice of the voter for some continuing candidate can be clearly ascertained. A 'continuing candidate' is a candidate as yet neither elected nor defeated. 'Successively' means one after another separately so far as the work of one electoral official or clerk is concerned; but nothing in this section is meant to prevent the transfer of ballots by two or more officials or clerks simultaneously, provided only that precautions are taken to avoid transferring any ballot to a candidate who has already received the quota.

"(*j*) The transfer of each ballot shall be tallied by the tally clerk assigned to the candidate to whom the ballot is being transferred.

"(*k*) After the transfer of all surpluses, the votes standing to the credit of each candidate shall be added up and tabulated as the second count.

"(*l*) After the tabulation of the second count (or after that of the first count if no candidate received a surplus on the first) every candidate who has no votes to his credit shall be declared defeated. Thereupon the candidate lowest on the poll as it then stands shall be declared defeated, and all of his ballots capable of transfer shall be transferred successively to continuing candidates, each ballot being transferred to the credit of that continuing candidate next preferred by the voter. After the transfer of these ballots a fresh tabulation of results shall be made. In this manner candidates shall be successively declared defeated, and their ballots capable of transfer, transferred to continuing candidates, and fresh tabulations of results made. After any tabulation the candidate next to be declared defeated shall be the one then lowest on the poll.

"(*m*) If, after the second or any later count (or after the first count if no candidate receives a surplus on the first) the total of the votes of two or more candidates lowest on the poll is less than the vote of the next higher candidate, those lowest candidates may be declared defeated simultaneously, and all their ballots capable of transfer, transferred successively to

continuing candidates, each ballot being transferred to the credit of that continuing candidate next preferred by the voter.   In this operation the ballots of the lowest candidate shall be transferred first, then those of the candidate next higher, and so on.   No fresh tabulation of results shall be made until the ballots of all the candidates thus simultaneously defeated have been transferred.

"(*n*) Whenever in the transfer of a surplus or of ballots of a defeated candidate the votes of any candidate become equal to the quota, he shall immediately be declared elected and no further transfer to him shall be made.

"(*o*) When candidates to the number of the seats to be filled have received a quota and have therefore been declared elected, all other candidates shall be declared defeated and the election shall be at an end; and when the number of continuing candidates is reduced to the number of seats to be filled, those candidates shall be declared elected whether they have received the full quota or not and the election shall be at an end.

"(*p*) If at any count two or more candidates at the bottom of the poll have the same number of votes, that candidate shall be declared defeated first, who was lowest at the next preceding count at which the number of their votes was different.   Should it happen that the number is the same on all counts, lots shall be drawn to decide which candidate shall next be declared defeated.

"(*q*) In the transfer of the ballots of any candidate who has received ballots by transfer, those ballots shall first be transferred upon which he was first choice, and the remaining ballots shall be transferred in the order of the counts by which they were received by him.

"(*r*) On each tabulation a record shall be kept under the designation 'non-transferable ballots' of those ballots which have not been used in the election of any candidate and which are not capable of transfer.

"(*s*) Every ballot that is transferred from one candidate to another shall be stamped or marked so that its entire course from candidate to candidate throughout the counting can be conveniently traced. The ballots shall be preserved by the central election

board until the end of the term for which the members of the city commission are being elected. In case a recount of the ballots is made, every ballot shall be made to take in the recount the same course that it took in the original count unless there is discovered a mistake that requires its taking a different course, in which case the mistake shall be corrected and also any further changes made in the course taken by ballots that may be required as a result of the correction. These principles shall apply to the correction of any error that may be discovered during the original count.

"(*t*) The candidates or their duly authorized representatives, and, so far as may be consistent with good order and convenience in the counting and transferring of the ballots, representatives of the press and the public shall be afforded every facility for being present and witnessing these operations."

It is said, and conceded, that these provisions outline correctly in its "essential principles," and adopt for the city, what is called the "Hare system" of proportional and preferential voting. At the election in question, as we understand the situation, there were 23 candidates nominated for the 7 offices of city commissioner to be filled under the new charter. Of the over 9,000 registered voters within the city only 4,461 took the trouble to visit the polls and vote; 157 ballots were declared invalid, leaving 4,304 to be counted and manipulated as prescribed in the charter. The quota found necessary to elect under that method was determined to be 539. Two of the 23 candidates had more than their full quota on first choice ballots. Then distribution of the surpluses and recounts as to the rest began. From that point, for the sake of brevity and accuracy, the narrative of what further was done by the election board in "counting ballots" pursuant to the provisions of section 183 will be found continued in Exhibit "A," herewith quoted, which is said to delineate plainly and concisely the count, tabulation and result of the vote at that election.

Exhibit "A"

Precinct Numbers

Whether this system proved to be "simple and understandable to all" the electors who voted in the city of Kalamazoo on that occasion is not disclosed, but over 30 years ago it was named in *Maynard* v. *Board of Canvassers,* 84 Mich. 228 (11 L. R. A. 332), as one of four different classes of schemes advocated by those proposing to effect what they claimed would be a reform in existing modes of election to secure for the minority a proportionate representation, as follows:

"4. The 'Hare' plan, or 'single vote.' This method is too intricate and tedious ever to be adopted for popular elections by the people. It requires successive counts and redistribution of the votes until an election is reached."

It does appear, however, that since 1859, when Thomas Hare first published a book in England explaining his system, three cities in the United States have adopted it, as "Leaflet No. 5" of the "American P. R. League," made a part of appellants' brief, informs us. Of the progress made by the Hare system of voting in this republic it advises:

"In America it is used for the election of the council or commission in three cities, Ashtabula, Ohio (since 1915), Boulder, Colorado (since 1917), and Kalamazoo, Michigan (since 1918). It is also used for the election of the representative bodies of many private organizations, including those of several great trade unions in England and Canada and that of the National Women's Trade Union League of America."

This leaflet illustrates at length and elaborately explains the system as claimed, states it is a method which results in "no division of voters," but instead *"condensation* by voluntary unanimous quotas"; and asserts, partly in italics, that the Hare system "makes it possible to adopt the 'city manager plan' of government *without sacrificing democracy."* If in this republic adoption of the city manager plan without resort to the Hare system actually sacrifices democracy,

numerous cities throughout the United States have already made the sacrifice.   In that connection it may be noted that the immediate question for determination is limited to the validity of the Hare system of voting, which is but one of numerous proposed methods for practical application of that theory for reform in representative government known as "proportional representation."   That conception, underlying a variety of proposed systems to materialize it, is based on representation in governmental affairs in proportion to numerical strength of parties or constituencies under some method of grouping the electors according to parties, interests, ideas, or, perhaps, other elements of affiliation, so that such grouped minorities may have representation in legislative and other official deliberative bodies as well as majorities.   Though fundamental to the Hare system of voting and in that aspect indirectly material here, it does not follow, and is not conceded by many advocates of the principle of proportional representation, that the Hare system solves the problem of its practical application.

The theory of proportional representation as an instrumentality for political reforms is not of recent origin.   In 1780, almost contemporaneous with the birth of this republic, the Duke of Richmond introduced a bill in the English parliament which contained a clause providing for minority representation, and, as noted in the *Maynard Case*, in 1844 Mr. Gilpin published a pamphlet in Philadelphia advocating its adoption according to a plan he had originated.   Since then the attention of men of inquiring minds in the field of political science has been attracted to the subject from time to time by earnest advocates who have espoused it and devised systems claimed practical for its application, while others of apparently equal sincerity and ability have deprecated the conception as unsound in theory, impractical and visionary.   Cer-

tain of its supporters have been energetic and prolific publicists. A list of books and references to periodicals relating to proportional representation published by the library of congress shows abundant reading matter in more than one language for those seeking information upon the subject, which has been much augmented by periodicals, pamphlets, leaflets and other publications, in a recent renaissance of propaganda according to latest approved methods by its advocates here and abroad. It has apparently been more favorably received, or at least made greater progress, in countries free from constitutional limitations and with a newer or different form of government than that of the United States. Commenting on that fact, The Survey, "A Journal of Social Exploration," under the interrogatory heading, "Are we really too stupid?" says:

"Proportional representation may be too difficult to be understood in America, but the newer democracies in Europe 'will use no other.' In Poland, Premier Paderewski and the members of the constitutional assembly have just been elected by that method. It was the first election in 140 years without foreign rule, and for the Jews, who constitute an appreciable portion of the urban population, practically the first participation in politics."

The Proportional Representation Review, a periodical published by the American P. R. League, tells, in the April, 1918, issue of its adoption by Russia, saying in part:

"The revolution which brought about the democratization of Russia introduced the principle of proportional representation into all elections in Russia.  *  *  *  There were from a dozen to a score of tickets nominated in various districts of the elections to local representative bodies and to the constitutional convention, and most of the political factions, except those with very small following, received representation."

Adoption of proportional representation by those and other war disturbed countries but recently liberated, for self-determination and adoption of a government by and for their people, perhaps throws little light thus far upon the subject, in theory or practice, beyond showing that it does not in practice always operate for the healing of nations as basically and promptly as many of its propagandists have prophesied, and that those countries least experienced in systems of government with the sovereign power vested in the people adopt that political policy with greater avidity than older nations of long experience which have made that form of government fairly successful and stable.   In that connection there is ground for saying that the slow progress of this attractive theory for political reform here, and elsewhere in older and more stabilized representative governments, can be attributed in part, at least, to misgivings, even by many recognizing the merits of the theory, as to a feasible method for its practical application which will correctly, and true to the theory, work out the beneficent results indicated.

In an able article advocating proportional representation contributed to The Nineteenth Century by Earl Grey in 1884, at a time when a proposition to embody it in a reform bill of the English parliament was agitated, he expressed an "honest desire to arrive at the nearest possible approach to the realization of the radical formula 'to every vote an equal value,'" and argued that objections to the doctrine "depended entirely upon the alleged complexity of its methods," but contended they could be overcome through a system of voting devised by the "joint labors of Mr. Seebohm and Mr. Parker Smith."   Upon that phase of the inquiry the searcher after truth in the abundance of controversial literature upon the subject will find many advocates of proportional representation confusingly

inharmonious. Many of their books, pamphlets, and magazine articles are largely devoted to some scheme or system, bearing the name of the author or its inventor, at marked variance with and pointing out the inadequacy of other systems by other inventors or authors equally earnest in urging theirs as the only logically correct and true system.

Recognizing this situation, the Proportional Representation Review advises its readers that the American P. R. League, under whose auspices Leaflet No. 5 was issued, "is not committed exclusively to any system of proportional representation," though it regards the Hare system best for most purposes, and will be glad to furnish detailed provisions for carrying out any other system which it regards favorably. A bulletin on proportional representation, prepared by R. Curtis under auspices of the political science department of Wisconsin university, in classifying the various plans promulgated· for voting to materialize that theory, groups them into seven general classes under separate headings, instead of four as in the *Maynard Case*, as follows: "Limited Vote," "Cumulative Vote," "Proxy System," "Single Untransferable Vote System," "The Quota," "List System," and "Preferential Systems." Under the last named, with a subheading, "single transferable vote," appears "Hare System (Andrae, Courtney, Lubbock, Spence, etc.)." The description of that subclass concludes with the information that, "The d'Hondt quota is not applicable to 'single transferable vote' systems," and consideration of the "preferential systems" then passes to that subclass called "Graduated Systems (preponderance of choice)."

To this but scant suggestion of the field open for study of comparative systems it may be added that the inquirer will often find arguments upon the merits of the various systems of voting devised to effectuate it and arguments upon the merits of proportional repre-

sentation itself in the abstract quite confusingly, but perhaps unavoidably, intermingled. Analytic comparison of these various systems is beyond the question, but as one further differentiation we note the caution by a writer in that line not to confuse the "Hare system" with the "Ware system." The latter was devised and promulgated by Professor Ware of Harvard university, who, from his major premises, reasons forcibly that if proportional representation had then obtained in the United States slavery would have been abolished without a civil war, against the contention of John Bright that had proportional representation been the accepted policy and settled practice in the States it would have been impossible to abolish slavery. Bright also broadly contended apparently even against its adoption in England that it involved "departure from the old lines of the Constitution," and was an "unconstitutional innovation." The question for determination here is narrowed to whether the Hare system is such in this land of recognized constitutional limitations.

But little relevant authority is to be found on the constitutionality of that system of exercising the franchise in this country. The determination is concededly contingent on the constitutional provisions of the several States where the question arises. The people of Oregon disposed of the constitutional question in 1908 by an amendment to their constitution authorizing proportional representation in the discretion of the legislature. In McCrary on Elections (4th Ed.), § 212, the author notes that Illinois has provided in its constitution for minority representation in its State legislature to be accomplished by a system of "cumulative voting," while in New York and Ohio attempts were made to provide by statute for minority representation, and the constitutionality of the method

provided was seriously questioned in the former, and altogether denied in the latter. Following further discussion of the subject the section ends with the reflection:

"It would seem, therefore, that minority representation and cumulative voting can be provided for only by constitutional provision."

In a general foot note under this section on the subject of minority representation there is enumerated the various schemes for voting to accomplish this purpose, amongst which appears, "Preferential voting, a plan devised by Mr. Thomas Hare, and advocated by him in a book upon the subject published in 1859," the theory of which is omitted, as in the *Maynard Case*, "because too complicated and intricate to be useful in popular elections." The author attributes the scant progress made in securing minority representation in State legislatures "partly to inherent deficiences and objections, which are found in every one of the schemes outlined, and partly to the irregularities and impropriety of the proceedings taken to incorporate the system into the State election laws where their introduction would be repugnant to the existing constitution."

The provision of section 1, Art. 3, of our present Constitution that "In all elections (a qualified voter) shall be an elector and entitled to vote," retains the language of section 1, Art. 7, of the preceding Constitution of 1850. When under section 21, Art. 8, of our present Constitution, authority was conferred upon the electors of cities and villages to frame, adopt and amend their charters "subject to the Constitution and general laws of this State," it is significant that precaution was taken in that connection to withhold from them the power "to abridge the right of elective franchise."

Our present Constitution of 1908 is for the most

part, as sometimes called, a revision of the former Constitution of 1850 which it follows closely in letter and spirit, the chief alterations relating to the manner of amending the Constitution, adapting it to certain changed conditions general throughout the State, and giving increased power to political subdivisions in matters of strictly local concern.  Six of the seven new sections in article 8 relating to cities and villages authorize and direct legislation by a general law conferring upon them autonomy as fully as seemed consistent with the established fundamental principles of State government, the seventh and last briefly stating a few limitations beyond which they could not go; the first named being that they should not have power to abridge the elective franchise, which can fairly be construed to mean in the light of established conditions and laws that the right of each elector to exercise the franchise and the relative value of his vote should be preserved as it existed under the Constitution and general laws of the State.  Subject to this the officers to be elected, subjects to be voted upon, time, place, manner of nominations, conduct of elections, etc., are in the main left open for charter provision.

In *State* v. *Constantine*, 42 Ohio St. 437, under a constitutional provision prescribing the qualifications of an elector, providing elections should be by ballot and that each elector "shall be entitled to vote at all elections," it was said the fair implication of the language, made certain in the light of State policy and existing circumstances when the constitution was adopted, entitled each elector of a district to vote for a candidate for each office to be filled.

In *Maynard* v. *Board of Canvassers, supra,* touching upon the provisions of our first Constitution of 1835, the policy, practice and legislation as to elections in this State thereafter, it was said of the provision yet retained in our Constitution:

"These laws were in force at the time of the adoption of the present Constitution, and have been continued in force ever since. They afford a practical construction of the right of every elector to vote for every officer to be elected, and that his vote shall be of equal effect with, and no more than, the vote of every other elector for every officer to be elected. * * *

"Giving to the language of the Constitution its ordinary signification, it declares the principle that each elector is entitled to express his choice for representative, as well as all other officers, which is by his vote, and the manner of expressing such choice is by ballot. When he has expressed his preference in this manner, he has exhausted his privilege; and it is not in the power of the legislature to give to his preference or choice, without conflicting with these provisions of the Constitution, more than a single expression of opinion or choice. * * *

"If the people of this State desire to provide for some different means to secure minority representation than that which is in a measure secured by the single district system under the present Constitution, they must do so through an amendment to that instrument, by which a proposition so vitally interesting to them may be passed upon by the popular vote."

The constitution of Minnesota provides elections shall be by ballot and that qualified electors "shall be entitled to vote at such elections * * * for all officers that now are or hereafter may be elective by the people," which is in substance the meaning of the language of our Constitution as construed in the *Maynard Case*. In *Brown* v. *Smallwood*, 130 Minn. 492 (153 N. W. 953, L. R. A. 1916B, 931, Ann. Cas. 1917C, 474), it was held that a preferential system of voting contained in the city charter of Duluth wherein first, second, and additional choice votes are authorized, to be counted in a provided contingently consecutive manner, was unconstitutional. The court there cites and quotes liberally from the *Maynard Case*, saying of the quoted constitutional provision:

"It was never meant that the ballot of one elector, cast for one candidate, could be of greater or.less effect than the ballot of another elector cast for another candidate. It was to be of the same effect. * * * The preferential system directly diminishes the right of an elector to give an effective vote for the candidate of his choice. · If he votes for him once, his power to help him is exhausted. If he votes for other candidates he may harm his choice but cannot help him. * * * The mathematical possibilities of the application of the system to different situations are infinite."

Counsel for appellants urges that the objectionable features pointed out by this court in the *Maynard Case*, found in the "cumulative" system then under consideration, are eliminated in the Hare system, of which the comments there made were not essential to a determination of the case; and that *Brown* v. *Smallwood*, *supra*, is not in point since, under the Hare system, it is impossible for a voter's second choice to be used to defeat his first choice, as may occur under "the so-called 'preferential system' which has no similarity to the Hare system except so far as the voter expresses his preference."

It may be conceded that what was directly said of the Hare system in the *Maynard Case* was in the nature of *dictum*, and even that those classifying it as a preferential system are technically inaccurate, but a similarity of the Hare system to the preferential system before the Minnesota court seems apparent in the particular that 'to the finite mind "the mathematical possibilities of the application of the system to different situations are infinite," and back of all those contentions over names, systems and methods, is the underlying and directly pertinent question of whether this system as scheduled in the Kalamazoo charter invades the constitutional right of every voter to vote for every officer to be elected and to have his vote so

counted as to have equal value and potentiality with the vote of every other elector who votes. The clearly stated conclusions of this court in the *Maynard Case* when construing the language of the Constitution upon that proposition were relevant there and to be recognized as acceptable precedent here. Under the Kalamazoo charter seven commissioners were to be elected at large. Each elector had the right to vote for seven candidates, by a vote not only "of equal effect with, and no more than, the vote of every other elector for every officer to be elected," but of equal potential value as to each of the seven candidates he voted for. As construed in the *Maynard Case,* the Constitution gave him the right to express his choice by a ballot vote for each of the seven commissioners to be elected; and having done so, he "exhausted his privilege." The Hare system limits his power to express his preference "in this manner" to but one candidate of the seven, only permitting him to express a second choice for one other, and so on by numerically dwindling and weakening choices until the elector has expressed thus "as many choices as you (he) please." As said in the *Maynard Case,* "it is not in the power of the legislature (nor a city adopting a charter under the home rule act) to give his preference or choice, without conflicting with these provisions of the Constitution, more than a single expression of opinion or choice"; and he has the right to express that single choice as to each of the officers to be elected in his district. While each voter can under the Hare system vote for all candidates to express sequential choices as provided, it is evident that his vote is primarily and positively effective for only one candidate.

It is true that the right of an elector to vote for all officers to be elected is limited to all officers to be voted for in or elected from his own political district, constituency or territory geographically defined by law

for choosing or electing officers who serve and represent it. Under its present charter Kalamazoo city constitutes a single district or constituency with seven commissioners elected from the city at large, for all of whom under the rule stated each elector of the city is entitled to vote; but appellants in avoidance of that apparent infirmity in the Hare system urge that the charter, of which the Hare system is a part, does in legal effect divide the electorate into seven districts or constituencies "based on common opinion instead of arbitrary geographical lines," with a system of voting and counting by which "every man's ballot is counted for one man who is his representative among the candidates on the legislative body," which would be all he could do were the city divided into seven wards, and therefore it cannot be said his right of elective franchise has been abridged. Counsel very interestingly discusses the advantages of that theoretical method of districting constituencies by boundary lines of opinion, belief or policy, but however alluring in theory, such intangible, undefined theoretical demarkation by similar thought or views is not a legal substitute for what is in law recognized to be a voting constituency or geographically defined representative district, as the right of franchise has become established under our Constitution.

While we cannot accept to the full extent urged appellee's contention that under the Hare system one elector's vote is necessarily of greater weight or counts for more candidates than that of another, the system does contain an element of the chance that it may so result. The framers of the Kalamazoo charter appear to have copied its rules for counting ballots as scheduled in section 183 practically verbatim from those set out in the January, 1917 (3d series), number of the Proportional Representation Review. An examination of rule (*h*) discloses a method of transfer

of surplus votes involving an element of chance by which the result can readily vary according to the shuffle, or chance position of ballots. This is recognized by the advocates of the Hare system, who call it the "Chance method," as distinguished from another proposed form for rule (h), called the "Exact method." This subject is discussed in a July, 1917, supplement sheet of the Review, stated as "not intended for the general reader." The leaflet contains illustrative or hypothetical elections and developed mathematical problems by which it is claimed to be demonstrated that the element of chance is comparatively slight. An actuary, mathematically skilled in the application of the doctrine of chances to financial and other affairs, might work with confidence upon the possibilities of this system, but to the non-expert there is force in the *dictum* of the *Maynard Case* that it appears "too intricate and tedious to be adopted for popular elections by the people." To the average elector the destiny of his vote is a mystery, however easy it may be for him to follow instructions in marking his ballot. In abridging the right of elective franchise as pointed out, we conclude the election method prescribed in section 183 of the charter is in contravention of our State Constitution and invalid.

In support of the claim that invalidity of the voting system appearing in the charter renders the entire charter void, the following reasons are urged:

"(a) The new charter was adopted as a whole and the provisions for a commission and the method of election of same must be construed as inseparable and mutually dependent upon each other, and as so intended by the people who adopted the charter.

"(b) The elimination of the objectionable features providing for elections does not leave a workable instrument."

We find nothing in the charter impelling a construction that the prescribed method of election, found in-

valid, and other parts of the charter are so inseparable and interdependent as to vitiate the whole, or that the charter would have been rejected by the electorate had the rejected provisions not been included. In the main this charter is an `exceedingly well worked out and carefully prepared commission form of city government charter, evidently the result of much labor and study of the authorities upon the subject and of the charters of other cities where that form of government had been adopted. For the most part it travels within beaten lines, many of which have stood the test of the courts. As to any experimental features the commissioners took the precaution to put an anchor to the windward by a section providing that if any section or part section of the charter proved invalid or unconstitutional it should not invalidate or impair the force and effect of any other unless it plainly appeared such other section or part was necessarily dependent upon the section or part found invalid. It would seem that the election provisions of the charter were carefully formulated to meet such a contingency, for entirely eliminating subdivision (*a*) of section 41, and sections 182 and 183, which contain all the election features questioned, a complete, practical charter, including independent, workable election provisions, yet remains. Section 5 of the charter provides for a city commission of seven members, elected for a term of two years from the city at large on a general ticket; section 31, as before noted, provides for registration of voters, nominations and elections to be held according to the general laws of the State; except as otherwise provided; section 33, a plan for nomination of candidates; section 34, the date of elections; and sections from 35 to 40, inclusive, contain appropriate provisions for a city election supplemental to the State election laws.

With the invalid election features stricken out the

charter yet contains ample machinery for nomination and election of all elective city officers. As applied to the situation presented here, we think the law well settled that rejection of those provisions held invalid does not affect the rest of the charter. *Attorney General* v. *Loomis*, 141 Mich. 547; *City of Battle Creek* v. *Barnes*, 143 Mich. 400; 36 Cyc. p. 976.

The trial court held the charter provisions relating to the Hare system of election unconstitutional, rendering the election of defendants invalid, and in a supplemental opinion concluded, "the court does not hold by reason of such unconstitutional provisions that the whole charter is invalid."

This information was filed and summons issued on September 13, 1919. Johnson's term of office as alderman, to which he was elected under the old charter, commenced April 10, 1916, and was for two years. The new charter abolishing said office was adopted February 4, 1918. He was a candidate for the office of city commissioner under the new charter at the first election, held on the first Monday of April, 1918, under the Hare system, and declared defeated by the election board. He did not then or before interpose any objection in legal form, or otherwise, so far as shown, to the new charter under which he ran, nor to the method of election, nor did he take any steps to do so thereafter until September 12, 1919, when he made application as a plaintiff, supported by his affidavit, to the prosecuting attorney for the information filed herein. Defendants' then terms as commissioners under the new charter expired on the second Monday of November, 1919. This case was heard in the circuit court of Kalamazoo county, October 29, 1919. An opinion was filed in that court January 7, 1920, and judgment of ouster entered January 17, 1920. So far as Johnson's right to the office he claims under such a state of affairs is concerned the court might well refuse to enter-

tain the proceeding under its discretionary power. *Osterhous* v. *Van Duren*, 168 Mich. 464. But the prosecuting attorney states in the information he filed that his action is not alone founded upon plaintiff's right to office, but "also as such citizen and taxpayer, and upon the right of the people of the State of Michigan to test the rights of respondents, etc.," and defendants urge with reason that an authoritative determination of the issues involving the validity of its charter is "of the utmost public interest to the city of Kalamazoo." Therefore, because public interest seems to require such course, the case is entertained only to pass upon those constitutional questions of public interest involved. Neither public interest, nor rules of practice, require us to pass upon the now in effect moot question of Johnson's right to the expired term of an abolished office (2 Stevens' Michigan Practice, § 498; *People* v. *Miles*, 2 Mich. 349; *People* v. *Mayworm*, 5 Mich. 148), and it may be added as a matter of public interest that upon the facts disclosed in this record it is fairly evident defendants and all city officers legally nominated and formally found elected under color of the voting system provided in the charter, who qualified and acted as such, were and are *de facto* officers whose official actions within the scope of the charter are valid until they are legally deposed from such positions.

As only questions of public interest are entertained and passed upon in this opinion, the conclusions of the trial court as to them are affirmed, without costs to either party.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, and BIRD, JJ., concurred. SHARPE, J., did not sit.